**DREHER LAW FIRM**
Robert Scott Dreher, Esq. (CSB #120527)
350 West Ash, Suite 101
San Diego, CA  92101
Phone: (619) 230-8828 / Email: _scott@dreherlawfirm.com_

**LAW OFFICE OF BLANCHE E. MAINE**
Blanche Elizabeth Amelia Maine (CSB #185718)
13465 Camino Canada, #106-428
El Cajon, CA 92021
Phone: (619) 750-9691 / Email: _blanche.maine@gmail.com_

*[Additional Counsel listed on following page]*

Attorneys for Plaintiffs.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

HOPE FOR THE HOMELESS LAKE-SIDE, INC., a California Nonprofit Corporation; BRIAN ALBONE; MICHAEL BISHOP; DANIEL CAPPASOLA; JAMES DATTOLICO; CHARITY DAVIS; JENNIFER GASKA; CHRISTY GILLETTE; STEVEN LEGGOTT; TODD LENT; AMANDA LUTHER; HAROLD LUTHER; JOHN "AUGIE" MARTINEZ; JILL MCCOY; BRITTANY STEBBINS; AUSTIN WHALEY; DAVID WILLIAMS; Individually on Behalf of Themselves and All Others Similarly Situated,

                    Plaintiffs,

v.

COUNTY OF SAN DIEGO; CITY OF LAKESIDE; CITY OF SANTEE; CITY OF SAN DIEGO; CALIFORNIA DEPARTMENT OF TRANSPORTATION; CALIFORNIA HIGHWAY PATROL; and DOES 1 – 50, inclusive,

                    Defendants.

Case No. '24CV1009 L    MSB

**CLASS ACTION COMPLAINT for INJUNCTIVE and DECLARATORY RELIEF AGAINST VIOLATIONS OF THE FOURTH, EIGHTH & FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION UNDER COLOR OF AUTHORITY (42 U.S.C. §1983); VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. §12132); and VIOLATIONS OF THE CONSTITUTION and LAWS OF THE STATE OF CALIFORNIA.**

**Jury Trial Requested.**

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

0

1

2  *Counsel for Plaintiffs (continued):*

3

4  **MILLER LAW FIRM**
   Matthew R. Miller (CSB #194647)
5  6790 Embarcadero Lane, Suite 100
   Carlsbad, CA  92011
6  Phone: (619) 261-1150 / Email: *Matt@mrmlawfirm.com*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

1

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

## INTRODUCTION

Homelessness should not come as a surprise to the people managing the County of San Diego and cities within it. The issue has been around for generations:

> *In the shadow of the steeple I saw my people*
> *By the relief office I seen my people*
> *As they stood there hungry, I stood there asking*
> *Is this land made for you and me?*

> -   Woody Guthrie, *"This Land is Your Land" (1940)*

But as the problem has worsened, the County of San Diego and many of its cities, including Santee and Lakeside, do nothing to solve it. Instead, they express fake surprise while actively ignoring the data showing increasing numbers of homeless people and corresponding decreases in the amount of affordable housing within their jurisdictions. Defendants respond to the data, and the problems it reflects, with very different lyrics from those of Mr. Guthrie:

> *"You're a piece of shit!"*
> *"Lakeside would be a better place without you!"*
> *"Get out of here or go to jail!"*
> *"Leave immediately or get arrested!"*
> *"Do not call back again."*
> *"You can't be here! Go to El Cajon!"*
> *"Get the fuck out of here! There's the answer for you!"*

Rather than create safe places where people without homes can "exist" with their meager possessions, while working to regain proper housing, as law and common sense would dictate, these Governments entities instead focus their efforts first, and solely, on using criminal statutes to *chase* and *destroy*. They justify the use of Municipal Codes, Local Ordinances, and State Penal Codes in this fashion as protecting "citizens' health and safety," while ignoring the irony of the fact that their actions are instead actively and willfully *endangering* and *harming* the "health and safety" of Citizens who have nowhere to sleep, live, or be. Defendants use "health and safety" as a pretext, and reject the notion that homeless people are "citizens."

2

Indeed, Defendants' actions appear designed to undermine and do the <u>opposite</u> of their express mandates and obligations under Welfare & Institutions Code §17000 to "*relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident*" who reside in San Diego County.

This lawsuit arises out of the ongoing policies and practices of the Defendants joining together to regularly and repeatedly chase homeless people "away," by raiding their sleeping sites and taking and destroying their property, in a coordinated effort to make it impossible for homeless people to live and exist, while simultaneously refusing to provide any other places for these people to "move" to.

Defendants conduct these raids without proper or adequate notice and in a manner designed to prevent people from retaining or reclaiming their personal property. Defendants' actions are intended only to make homeless people "disappear."[1]

This land <u>is</u> made for all of us, as Mr. Guthrie correctly noted. Accordingly, Plaintiffs, on behalf of themselves and all similarly-situated Citizens, ask the Court to Order these Defendants to take the only correct, legal, ethical, and just actions – (1) to cease taking and/or destroying Plaintiffs' and others' property without providing any proper and reasonable method for these unhoused citizens to retain and/or retrieve it; (2) to create sufficient, adequate, and accessible Safe Places for all their unhoused Citizens to sleep, to be, and to store their possessions; (3) to stop raiding, sweeping, chasing, threatening, arresting, and criminalizing unhoused Citizens unless and until such Safe Places first exist, accessible and available for all of these people without hassle or delay; and (4) to stop endangering the health and safety of homeless Citizens, and properly comply with their obligations under Federal and State law, including W&I Code §§17000 and 10000.

---

[1]   "*Could it be that the real reason I pretended to ignore a man in need was because I was trying desperately not to see him as a human being for whom I was responsible?*" Kate Cohen, <u>Washington Post</u>  https://www.washingtonpost.com/opinions/2023/12/29/real-reason-beggars-giving/

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over these claims for relief pursuant to 28 U.S.C. §1343(a)(3) and 42 U.S.C. §1983. Supplemental jurisdiction over Plaintiffs' state law claims exists pursuant to 28 U.S.C. §1367. Jurisdiction supporting the claim for attorneys' fees is conferred by 42 U.S.C. §1988.

2. Venue is proper in the Southern District of California because all Defendants reside in the District and all the events giving rise to Plaintiffs' claims occurred in the District. The relief Plaintiffs seek is within this Court's power to grant.

**CLASS ACTION ALLEGATIONS**

3. Plaintiffs bring this action on their own behalves and on behalf of all other persons similarly situated pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2). The Main Class of people that Plaintiffs represent consists of all those persons in the County of San Diego and the East County areas of the City of Santee and/or the unincorporated City of Lakeside who: (1) have been the subjects of Defendants' threats of sweep(s), citation(s), arrest(s), detention(s), warning(s), other threat(s), chase-away(s) efforts, and property seizures, destructions, and/or confiscations, or other enforcement action(s); (2) were homeless at the time of Defendants' enforcement actions, sweeps, and property-takings; and (3) were homeless and as such had nowhere else to place themselves or their belongings except on public property at the time(s) of Defendants' action(s).

4. Plaintiffs also bring this cause of action on behalf of a subclass, referred to as the "Disability Subclass," or "Subclass," which is defined as: All Class Members who have a "disability" as defined under the ADA, 42 U.S.C. §12102. All members of the Subclass are also members of the Main Class. The terms "Class" and "Classes" refer to both the Main Class and the Subclass, collectively.

5. This action meets all four elements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Additionally, this suit may be maintained as a Rule 23(b)(2) class action because Defendants have

4

acted on grounds that apply generally to the Class, so that final injunctive and/or declaratory relief is appropriate respecting the Class as a whole.

6. The members of the Class are so numerous that individual joinder of all Members is impracticable.[2] The Class is comprised of hundreds of individuals who are homeless in the County of San Diego and/or the Cities of Santee and Lakeside, and who have been wronged by Defendants' improper actions. Joining all these individuals in this lawsuit is impractical and unnecessary. In addition, Plaintiffs believe that the Subclass consists of hundreds of homeless individuals based on the high number of persons with disabilities found in surveys of the homeless population in San Diego. In fact, "Countywide, only 10 percent of people have disabilities, while people with disabilities make up 58 percent of the homeless population."[3]

7. Questions of law and fact are common to the Class.[4] The claims asserted "depend upon a common contention of such a nature that it is capable of class-wide resolution...",[5] and show that the Class is affected by a "general policy" on the part of the defendants.[6] The Class is united in its interests with respect to proof of Defendants' conduct, the alleged effects caused by Defendants' actions, and whether Defendants' actions violate the law and Plaintiffs' constitutional rights.

8. Plaintiffs assert claims typical of the Class.[7] Class Representatives have the same essential characteristics as the Class, in that they are, or were, homeless at the time of Defendants' actions, and they had nowhere else to place themselves or their belongings other than public property. The proposed Class is united in the factual questions underlying this case, including: whether Defendants are improperly taking and destroying and failing to return Plaintiffs' property; whether Defendants by their

---

[2]    Fed. R. Civ. P. 23(a)(1).
[3]    Warth, Gary. "County's Homeless: Disabled, 55 and older and Black." SD Union Tribune (September 15, 2020) (*https://www.sandiegouniontribune.com/news/homelessness/story/2020-09-15/countys-homeless-disabled-55-and-older-and-black*).
[4]    Fed. R. Civ. P. 23(a)(2).
[5]    *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2553 (2011).
[6]    *Id.* at 2553.
[7]    Fed. R. Civ. P. 23(a)(3).

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

actions are endangering the health and safety of Plaintiffs and Class Members; whether there are insufficient shelters and services and storage facilities provided to accommodate Plaintiffs and the Class Members and their possessions; whether some belongings (like blankets, tarps, medicine, etc.) qualify as "basic human needs" for people experiencing homelessness; whether Plaintiffs are capable of complying with Defendants' threats and demands, as currently promulgated and enforced; and whether Defendants maintain a policy of systematically taking such illegal actions against the Class. Factual differences in Plaintiffs' individual respective circumstances are not legally significant to the constitutional claims asserted in this action and do not defeat typicality. There is no unusual treatment from Defendants that defeats the typicality of Class Representatives' claims. The Class Representatives' interests "align with the interests of the Class," and they have endured the same courses of conduct directed against the Class.[8] Class Representatives seek injunctive and declaratory relief to protect the civil rights of the entire Class, and they seek no individual gain in the form of damages or other relief, nor do they assert individualized claims that would disadvantage the Class.

9. Class Representatives will fairly and adequately represent the interests of the Class and have no interests antagonistic to the interests of the Class.[9] Plaintiffs' interests are aligned with those of the Class Members, all of whom stand to benefit from the relief sought in this action. Plaintiffs have retained lawyers who are competent and experienced in class action litigation, who will zealously represent the interests of the Class and its Members. Class Representatives have agreed to represent the interests of the entire Class, are dedicated to taking an active role in this litigation and are committed to fulfilling their responsibilities to the best of their ability, and participating in all phases of this lawsuit—including meeting with counsel regularly, appearing for depositions, and participating as needed at trial.

---

[8] *Just Film, Inc. v. Buono,* 847 F.3d 1108, 1117-18 (9th Cir. 2017).
[9] Fed.R.Civ.P. 23(a)(4).

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

10. Plaintiffs' Counsel are well-qualified under the factors of Fed. R. Civ. P. 23(g)(1)(A). Counsel have: (1) spent significant time identifying and investigating potential claims in this action, including interviewing Class Members, and investigating relevant facts and laws underlying this claim; (2) have successfully handled class action lawsuits and other complex litigation matters in the past, including the types of civil rights claims asserted in this action; (3) have extensive knowledge of applicable civil rights laws; and (4) are committed to spending the time and resources necessary to effectively represent the entire Class.

11. These are the types of large-scale and widespread constitutional claims that fall within the purview of F.R.Civ.P. 23(b)(2), allowing the Court to address constitutional issues while providing access to justice for displaced and vulnerable people who would not otherwise be able to avail themselves of the judicial system. The disposition of these claims in a class action will benefit all the parties to the case, and all the citizens of the County of San Diego, by ensuring proper treatment of all County residents by its governmental entities and agents. Disposition of Plaintiffs' and proposed Class Members' claims will also provide substantial benefits to the Court, allowing it to address a systemic issue in one case, rather than having to address potentially hundreds of related civil rights actions individually.

12. Further, class treatment will permit the adjudication of claims by many Class Members who could not afford to individually litigate their claims or seek to enforce or vindicate their rights against the governments' improper actions. There are no difficulties likely to be encountered in the management of this case which might preclude its maintenance as a class action, and no superior alternative exists for fair and efficient adjudication of this matter. This action will promote orderly and expeditious administration and adjudication of the claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured. Absent a class action, Class Members will continue to suffer threats, injuries, and other harm, and Defendants' violations of law will continue without remedy.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

13. The people whom Plaintiffs represent are in dire need of the relief sought, as they have been, are being, and will continue to be harmed by Defendants' illegal actions. The rights at stake are fundamental, and absent class certification, these people have no way to address ongoing violations of their civil rights.

14. Furthermore, it is not just the Class Members who will benefit from the relief sought herein; all citizens of San Diego County will benefit from an Order which effectively compels the Defendants to properly follow the law and do more than waste public funds and public efforts in their fruitless efforts to "sweep" and chase their Citizens away, out of sight.

## THE PARTIES

### A. Plaintiffs.

15. Plaintiff **HOPE FOR THE HOMELESS LAKESIDE ("HOPE")** is a 501(c)(3) nonprofit corporation organized and existing under the laws of the State of California and doing business in San Diego's East County, California. HOPE's mission is to care for the unhoused residents of San Diego's East County while recognizing the dignity and human rights of unhoused people. Through community organization and advocacy, HOPE provides basic necessities to unhoused residents of Santee and Lakeside and co-sponsors events with other nonprofits such as Think Dignity to provide showers, warm meals, survival gear, and hygiene products. HOPE's work envisions a County in which every human being can have and maintain decent, habitable, safe, and secure housing, and this work requires daily engagement with unhoused communities of Santee and Lakeside. HOPE's mission includes engaging volunteers and donors to provide unhoused people with the basic necessities needed to survive while living unsheltered. Over the past year, HOPE's work has been hampered and undone by Defendants' criminalization and property-destruction practices and other efforts to undermine and discourage such work.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

8

16. Plaintiff **BRIAN ALBONE** lives in Santee and at all relevant times was and is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

17. Mr. ALBONE is a professional tree trimmer who worked for over a decade with Ace Tree Removal until the owner passed away and left Mr. ALBONE the business. He worked hard to keep that business thriving, but when his wife, Rose, passed away in 2019 of COPD, Mr. ALBONE fell into a deep depression, and attempted suicide because he "*didn't want to live without her.*" He lost the tree trimming business and was evicted from the apartment he had shared with his wife, and soon was forced to begin living on the streets. Not having a place to live makes it impossible for Mr. ALBONE to find full-time employment. Mr. ALBONE is also disabled due to severe depression and bipolar disorder, lives in constant fear of losing his remaining possessions, and is struggling with ulcers due to the constant stress he endures. He has been the subject of repeated sweeps by Defendants at the San Diego River Bottom in Santee, is relentlessly threatened by them with arrest and citation for illegal lodging and trespassing and is constantly ordered to "*Move along!*" Defendants, without providing any prior notice, took from him all his clothing, bicycles, tools, tree-trimming gear, and all his family photographs including the only remaining pictures he had of his parents. Defendants never gave Mr. ALBONE an opportunity to take, or keep, or recover his belongings that they took, despite his requests. Defendants have never offered him any helpful services or a place to sleep safely.

18. Plaintiff **MICHAEL BISHOP** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C §11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

9

19. Mr. BISHOP is a carpenter and a paver by trade. Covid caused the loss of much of his employment, and he began living out of his car after his wife died and he could no longer afford their apartment. Eventually Mr. BISHOP lost his car and was forced to live on the streets in his hometown of Lakeside near the San Diego River Bottom and the Sand Pits. Mr. BISHOP went to this spot because it seemed out-of-the-way and private, such that he would not suffer the indignities and stigma of being homeless that he saw others enduring. But such was not the case.

20. On or about July 3, 2023, Mr. BISHOP's encampment was swept by the Defendants and their agents. As Mr. BISHOP watched the Defendants rummage through his belongings, he overheard one of their agents saying, "*Where is the good stuff?*" Defendants threw most of Mr. BISHOP's important documents and possessions into the trash truck during this sweep, but he saw one of the Defendants' agents taking and placing a box of his more valuable belongings, apparently "*the good stuff*") inside their supervisor's truck cab. Those things were not thrown away, nor were they offered for retrieval, and they included valuable and irreplaceable items such as his great-grandfather's pocket-knife, his family photographs including his children's school pictures, jewelry, and watches. Mr. BISHOP also lost important documents that are difficult to replace (even if one is not unhoused), including his driver's license, social security card, birth certificate, and court papers. During the time Mr. BISHOP has been unhoused, he has been harassed many times by Defendants and their agents, and been issued citations for illegal lodging (Cal. Penal Code §647(E)), while never being offered any shelter, services, or alternatives. Recently, Mr. BISHOP was provided a hotel voucher after his counsel repeatedly requested accommodations pursuant to the Americans with Disabilities Act. Unfortunately, Mr. BISHOP has been placed at Hotel Circle and removed from his East County support network and community, which makes it nearly impossible for him to receive food assistance or to seek employment in the area where he has connections and has long resided.

DREHER LAW FIRM

350 W. ASH STREET SUITE 101

SAN DIEGO, CA 92101

21.  Plaintiff **DANIEL CAPPASOLA** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C §11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

22.  After a series of tragedies including the death of his beloved grandfather, Mr. CAPPASOLA fell into a deep depression and was unable to work. Then, he lost his driver's license due to an unpaid ticket. The series of unfortunate events continued, leading to Mr. CAPPASOLA finding himself homeless and living under the highway 67 Bridge in Lakeside in June 2023, when Defendants CALTRANS, CHP, SDPD, and Alpha Project descended upon his encampment for an early-morning sweep.

23.  Although a so-called "Notice" poster of the sweep had been placed at the site stating that any property of value found in the "sweep" would be stored for 90 days, this didn't happen. Instead, Defendants threw all of Mr. CAPPASOLA's personal property into a trash compactor truck. And in yet one more of the many ironies of Defendants' actions, Defendants left actual "trash" on the ground there.

24.  Mr. CAPPASOLA observed Caltrans, SDPD officers, and Sheriff's deputies sort through and place some the most valuable items from the site into their vehicles. When he went to reclaim his belongings pursuant to the posted "Notice," nothing was provided to him.

25.  Plaintiff **JAMES DATTOLICO** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

26.  Mr. DATTOLICO is a native San Diegan and worked in construction and as a welder. Unfortunately, he lost his job during Covid and has since struggled to find full-time employment, and consequently became homeless.

27.  Mr. DATTOLICO lives in various areas of Santee in an attempt to avoid harassment and "sweeps" by Defendants. Nevertheless, he is repeatedly subject to

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

11

harassment and "sweeps" by Defendants. Defendants typically arrive with a large pick-up truck, with which they take all of his and others' belongings while offering no time or opportunity to gather and take their possessions. Those items, including valuables, medications, photos, and important documents such as his driver's license, are always taken by Defendants and trashed; never returned to him or held for recovery. During these sweeps, Mr. DATTOLICO is always told to "*move along or you'll be cited and arrested.*" But he is never told <u>where</u> he can go where he would <u>not</u> be subject to citation or arrest. So, each time this happens, he has no other option but to relocate to another hiding place, out of sight.

28.   Plaintiff **CHARITY DAVIS** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as she lacks a fixed, regular, and adequate nighttime residence.

29.   Ms. DAVIS graduated from Crawford High School and then attended S.D. City College studying Child Development and Physical Education. Her education was interrupted when she became pregnant and got married, but that marriage ended when her husband became abusive to her and their children. She was unable to finish her education, work, and care for the children alone, and her ex-husband's mother was able to get the kids removed from Ms. DAVIS' custody and move them away to Idaho. "*My kids were my world,*" she says. The loss of her children pushed Ms. DAVIS into a deep depression, and she found herself homeless as a result.

30.   Ms. DAVIS now suffers repeated harassment by Defendants for being homeless. Her attempts to safely sleep, exist, and recover have been derailed by Defendants' repeated raids, sweeps, and threats of citation, arrest, and jail if she does not "*move along,*" although she's never been offered anyplace to "*move along" to.*

31.   Ms. DAVIS was forced to move from an encampment in LAKESIDE after a sweep by Defendants and their agents, including the Sheriff's Department, Lakeside River Park Conservancy, and Caltrans, who told her to "*move to Santee.*"

12

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

However nothing changed after she did so – Ms. DAVIS continued to experience the same problems with the authorities in SANTEE, frequently without proper notice and with no offer of alternative shelter. On July 19, 2023, Ms. DAVIS was awakened near the SANTEE river bottom in the early morning hours by the SD SHERIFF'S DEPARTMENT, Alpha Project, and SANTEE city employees. They began indiscriminately tossing all her personal belongings into a trash truck, without sorting or examining such items, which included her deceased father's ring, her dentures, photos of her children, her bicycle, clothes, shoes, and other possessions. Ms. DAVIS tried to go inside her tent to take some of her important items but was physically prevented from doing so by a SD SHERIFF's Deputy, who then threatened her with arrest for "illegal lodging" if she didn't leave within the hour. Defendants also took her two cats, "Shadow" and "Racquet."

32.  Plaintiff **JENNIFER GASKA** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as she lacks a fixed, regular, and adequate nighttime residence.

33.  Ms. GASKA is a longtime resident of Lakeside and the mother of twin boys. She fell on hard times after a difficult divorce left her without steady housing or co-support. She struggles with depression, anxiety, and nightmares, making it difficult for her to get a good night's sleep or steady work, increasing her difficulty finding services or a home. She is also forced to live in a heightened state of fight-or-flight due to Defendants' constant harassment and threats.

34. Ms. GASKA has had her most valued personal property taken during Defendants' sweeps. Without giving her any opportunity to keep, take or recover any of her survival gear, blankets, food, and clothes, photographs of her sons, her jewelry, and books, Defendants repeatedly confiscated and threw everything away in a trash truck while they forced her to watch helplessly. On another occasion, Defendants stormed into Ms. GASKA's sleeping site early in the morning,

13

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

awakening Ms. GASKA. She immediately needed to "relieve herself" but was forced to stay at her site and forego such bathroom break. Defendants had a "porta-potty" with them, and she asked if she could use it. Despite the "porta-potty" being unused, Defendants said "*No!*" and laughed at her when she could no longer hold-in and involuntarily urinated on herself.

35. Plaintiff **CHRISTY GILLETTE** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as she lacks a fixed, regular, and adequate nighttime residence.

36. Mrs. GILLETTE, age 51, is a widow and mother of two deceased children. She worked as a waitress until 2018 when her health took a bad turn. She then lost her job and her residence and has been unable to find new work or housing. She is disabled and cannot walk without the use of a metal "walker" device. She suffers from bipolar and schizoaffective disorders, and struggles with night terrors, which have become aggravated by her unhoused and vulnerable situation.

37. In 2022, Mrs. GILLETTE was sleeping at a secluded public property in a remote area near the SANTEE Drive-In Theater. In the early morning hours, SD SHERIFF's Deputies descended upon her sleeping site and awakened her. Then, they informed her that "*you will be arrested if you do not leave immediately!*" They did not inform her of any opportunity to find services or a safe place to sleep. The Deputies also refused to permit her to collect or take any of her possessions.

38. Mrs. GILLETTE explained that she could not walk without her "walker" and that therefore she could not follow their instructions to "*leave immediately*" without it, and she asked if she could take it. The Defendants refused her request, and instead forced her to watch as they threw her "walker," along with everything else, *including her husband's and son's cremated ashes*, into their trash bins. They did, however, helpfully repeat their threat that "*We will arrest you if you don't move along!*"

14

39. In addition to her "walker," Defendants trashed all of Ms. GILLETTE's clothes and blankets, and all of her documents including her State ID and social security cards, tax forms, and birth certificates. They also took her few remaining photos of her with her husband and son, ensuring that she had nothing left to help remember or memorialize them. Defendants have effectively deleted her and her family from society – which appears to be among the goals of Defendants' actions.

40. Plaintiff **STEVEN LEGGOTT** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

41. Mr. LEGGOTT was born and raised in SANTEE. He's worked as a machinist for companies such as Rohr Industries, Teledyne Ryan Aeronautical, and Kahl Scientific in El Cajon prior to the death of its owner. After the owner of Kahl Scientific passed away, the company eventually went bankrupt, and Mr. LEGGOTT found himself without employment for the first time in his life. He was thus suddenly unable to pay for his housing, support, a car, or other necessities, and found himself living on the streets, homeless. He applied for work with, and was hired by, Home Depot, Walmart, and Target, but when they found out he had no permanent address he was immediately fired. Once he was forced to live on the streets, he quickly began receiving "illegal lodging" (PC §647(E)) tickets from Defendants.

42. In early July, 2023, Defendants swept-in unannounced to Mr. LEGGOTT's campsite. He was forced to watch, helplessly, as the Defendants went through his belongings, kept for themselves things they felt had value, and tossed everything else belonging to Mr. LEGGOTT into their trash receptacles. A Sheriff's Deputy threatened him, saying: "*Leave or get arrested!*" A social worker who was present felt so badly for Mr. LEGGOTT that she opened her wallet and handed him $40.00.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

15

43. During the raid, Mr. LEGGOTT was offered a hotel voucher, which he eagerly accepted. The social worker took Mr. LEGGOTT to an El Cajon hotel, assisted with his check-in and then departed. Whereupon the hotel staff immediately kicked Mr. LEGGOTT back out of the hotel, with no explanation. They kept the voucher. It was raining, and Mr. LEGGOTT was forced to walk back to Santee with only a plastic trash bag to shelter himself and his dog from the rain that night.

44. Among the items Defendants took from Mr. LEGGOTT were his tent, sleeping bag, clothing, boots, flashlights, ice box, bicycle, work tools, and cellphone. They also took and destroyed irreplaceable items such as family photos, his dad's ring which was passed to him after his father died, and his yearbooks from Santana High School with handwritten messages from his high school friends and teachers. They also took his birth certificate, social security card, and his dentures.

45. On Friday, October 6, 2023, Defendants repeated their actions, arriving at Mr. LEGGOTT's campsite in the early morning hours and, as per usual, threatening to arrest him if he did not leave. This time they offered no vouchers or other options or places to be. They added that if he returned to this area, he would be arrested. He was given no advance notice of this sweep, and again was refused any opportunity to collect his newly-acquired personal belongings. Defendants again threw away all of his personal property into a large dumpster.

46. Plaintiff **TODD LENT** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

47. MR. LENT is a resident of Lakeside. He does his best to stay out of the public's sight, often sleeping under the 67 Bridge or behind Burger King off Maine Street. Over the past several years, Mr. LENT has been subject to repeated sweeps and property confiscations by Defendants, without warning or opportunity to gather

16

his belongings or recover them from confiscation, solely because he has nowhere to sleep other than public space. Instead, he is threatened with citation or arrest unless he "*moves along!*" Mr. LENT has lost multiple phones due to Defendants' unlawful actions, along with his clothes, shoes, rain and cold weather gear, tents, his custom-made bicycle, his work tools, a Dell computer, a laptop, his birth certificate and driver's license, his dentures, and a treasured 1953 physics book.

48.  Plaintiff **AMANDA LUTHER** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as she lacks a fixed, regular and adequate nighttime residence.

49.  Ms. LUTHER was born and raised in SANTEE. She is the mother of two young children who have been placed in foster care due to her current situation of homelessness. Ms. LUTHER lost the apartment she was renting after she broke up with her boyfriend, and due to financial constraints and unaffordable rents Ms. LUTHER was unable to secure new housing for herself and her children.

50.  Ms. LUTHER has been repeatedly harassed and cited by the Defendants, including the Sheriff's Deputies, CHP, and Santee City Workers during their sweeps, and her pleas with them not to destroy her belongings are ignored and laughed at.

51.  When Ms. LUTHER was 7 months pregnant, Defendants impounded her legally-parked Ford Explorer from in front of O'Reilly Auto Parts in Lakeside at 10:30 in the morning. Despite her requests, Defendants refused to allow her to take the vehicle. At the time, Ms. LUTHER was living in the vehicle and had no money to pay the impound fee charged by Defendants. The Sheriff's deputy orchestrating the impound didn't offer any services or options, but he did take the time to inform Ms. LUTHER that she was "*[A] piece of shit and you're going to lose your child anyway!*" and that "*Lakeside would be a better place without you!*" Ms. LUTHER was then forced to begin living outside, on public property, while pregnant.

DREHER LAW FIRM

350 W. ASH STREET SUITE 101

SAN DIEGO, CA 92101

52.   Today, Ms. LUTHER resides at the San Diego River Bottom in Santee with her father and boyfriend and a small community of unhoused individuals who have formed a "family" to help and protect each other. Ms. LUTHER has pursued shelter, but the only shelter offered was East County Transitional Living Center ("ECTLC"), which she was forced to leave after one evening due to unsanitary conditions, including a cockroach infestation.

53.   Ms. LUTHER has been repeatedly harassed by the Defendants, including the SD SHERIFF'S DEPARTMENT, CALTRANS, Alpha Project, and the Cities of SANTEE and LAKESIDE, amongst others, for being homeless and forced to sleep outside. During sweeps of her encampments, including those in July 2023, Defendants have taken all of Ms. LUTHER's survival gear including tents, sleeping bag, blankets, clothes, bicycle, and food, and destroyed her ID cards and other important documents and valuable items, including birth certificate, her daughter's first tooth, her son's birth certificate, jewelry, her photographs of children and family members, and a treasured gift from her deceased uncle, an 1888 horoscope book.

54.   Plaintiff **HAROLD LUTHER** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

55.   Mr. LUTHER was born and raised in San Diego's East County. He is a 59 year-old father and a grandfather. After many years working in construction, his construction work dried up and he could no longer afford his rising rent payments, and eventually became homeless – now more than a decade ago.

56.   Over the past several years, Mr. LUTHER has been harassed repeatedly by the Defendants and their agents. This has included being threatened with arrest or citation, and being told to *"Move!"* No reasonable prior notice of these sweeps is ever provided by Defendants. He has been cited and arrested for "illegal lodging" on numerous occasions and he has been forced to watch as Defendants remove and

18

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

destroy his survival gear and irreplaceable belongings. Defendants have placed some of his more valuable property inside the front cabs of their trucks and patrol vehicles. None of these items has ever been offered for return, or returned, to Mr. LUTHER.

57.  During a July 2023 "sweep" of his homeless encampment by Defendants CITY OF SANTEE, SD SHERIFF'S DEPARTMENT and their agents, many of Mr. LUTHER's items taken and/or trashed by Defendants were items he had acquired with the help of Plaintiff HOPE as replacements for items previously taken by Defendants. Mr. LUTHER has had tents, work and construction tools, fishing poles, tackle boxes, sleeping bags, clothes, food, 3 scooters, and 4 motorized bicycles, amongst other items taken and thrown away by Defendants. They have also taken his irreplaceable belongings including jewelry, his father's watch, and photographs of deceased family members.

58. On these occasions, Defendants threatened Mr. LUTHER with arrest and refused to permit him to take any of his possessions. They didn't provide him any information about accessible services or places where he could live or sleep as a homeless person. Instead, their sole offer of "help" was: "*Leave now or go to jail!*"

59.  Plaintiff **JOHNNIE "AUGIE" MARTINEZ** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

60.  Mr. MARTINEZ is the father of nine children. He worked driving a forklift at the Port of San Diego for many years. COVID hampered his employment, however, and two years ago, he was forced into homelessness due to the rising costs of living, increasing rent, and lack of sufficient income to pay such. He currently works odd construction jobs to try and get back on his feet and out of the vicious cycle of homelessness. Mr. MARTINEZ's young son is on the autism spectrum and requires special educational services. Until becoming homeless, Mr. MARTINEZ played an active role in his son's life. Now he is unable to do so.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

61.   Since becoming homeless, Mr. MARTINEZ has been the subject of repeated sweeps by Defendants at the San Diego River Bottom in Santee. He is under the constant threat of arrest and citation for alleged "illegal lodging" and "trespassing." During the past year, the City of Santee has posted several purported "eviction" notices near his encampment, listing "dates" on which these "evictions" would occur.  Yet, more often than not, Defendants do not come on the date(s) indicated, and instead arrive days or weeks later without additional notice, seize all his and others' possessions, including survival gear and important papers, and then threaten all of them with arrest and citation if they do not leave.

62.   Plaintiff **JILL McCOY** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

63. Ms. McCOY is a loving mother and grandmother who graduated from welding school and worked as a mechanic for the Nissan Body Shop in El Cajon. She was also employed as a professional caretaker and animal keeper. She and her adult son became unhoused shortly before COVID. Unfortunately, while sheltering at the San Diego River Bottom, Ms. McCOY suffered a stroke and was lifted by a crane for emergency medical treatment. She later learned that the Fire Department made a training video using her incident without her knowledge or consent. Since suffering the stroke, Ms. McCOY has been unable to work due to continued symptoms that limit her ability to perform certain tasks. She has since suffered a series of additional medical setbacks that have kept her from gainful employment, and, because Defendants offer no assistance to her or for her conditions, she is relegated to sheltering out of sight with a small community of people she can trust as a single woman with debilitating medical conditions.

20

64. On or about August 4, 2023, Defendants "swept" Ms. McCOY's shelter site, and didn't offer her (or any other citizens at the location) any shelter options or services, other than "*10 minutes to grab your stuff and go!*" Due to her disabilities, Ms. McCOY was unable to "grab" everything. Defendants took her deceased son's skateboard, a bicycle, and her only family photographs. They also took jewelry and her valuable medications which included diabetes medicine (insulin), blood pressure medicine, and the antibiotics she was prescribed. They also took from her some small solar panels upon which she relied to charge her own and others' cellphones.

65. Plaintiff **BRITTANY STEBBINS** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as she lacks a fixed, regular and adequate nighttime residence.

66. Ms. STEBBINS is the mother of two children and was a full-time server at Outback Restaurant for nine years. She was also the caretaker for her ill mother who was suffering from lupus. When she was no longer able to work full-time and care for both children and ailing mother at the same time, Ms. STEBBINS lost her job and found herself and her children unhoused and living on the streets in Lakeside. Ms. STEBBINS faced a dilemma encountered by many single moms -- she couldn't leave her kids home alone while she worked, but was unable to afford childcare for them in order to work. Then her children were taken from her into foster care because she wasn't able to financially support them. Ironically, nothing similar to "foster care" was offered to Ms. STEBBINS, despite Defendants' claims that their actions were designed to protect "*our citizens' health and safety.*"

67. On multiple occasions, Ms. STEBBINS' possessions have been taken and tossed away by Defendants and their agents during relentless and repeated "sweeps" near the San Diego River Bottom in Lakeside and other locations. Usually, these sweeps occurred without any advance notice.

DREHER LAW FIRM

350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

21

68.  On May 17, 2023, Defendants took her survival gear and what was left of her personal belongings during a sweep at the San Diego River Bottom in Lakeside. Defendants actively prevented her from collecting anything, then confiscated and destroyed her personal property, which included her vaccination records for her and her dog, clothes, blankets, tent, her backpack, and other survival gear, along with jewelry and photographs of her children. The only "help" Defendants offered Ms. STEBBINS was a recommendation to "*Move or be arrested*!"

69.  Plaintiff **AUSTIN WHALEY** is resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular, and adequate nighttime residence.

70.  Mr. WHALEY graduated from Granite Hills High School with honors. He then graduated from California Institute of Automotive Technology and worked as a Master Mechanic for over 10 years. He is also a certified smog technician.

71.  In recent years, Mr. WHALEY fell on hard times because he could not afford the rising rents in San Diego's East County and began living out of his prized, classic 1972 Chevy Nova. Mr. Whaley started and for a time ran a successful mobile car mechanic business out of that vehicle, until SD Sheriff's deputies illegally impounded the car and then stole and kept it for their personal use and benefit.

72.  Mr. WHALEY has been forced to live on the streets in Santee and Lakeside, and has had all of his personal effects taken from him during repeated sweeps by Defendants of his homeless encampments, the most recent of which occurred in July 2023. Defendants have taken all of Mr. Whaley's survival gear and his irreplaceable belongings including a valuable coin collection, jewelry, and family photographs. Out of everything Mr. WHALEY has lost, he explains, "The worst thing is I haven't spoken with my parents who live in Alpine for years because of the shame I feel about being homeless."

73.  Plaintiff **DAVID WILLIAMS** is a resident of the County of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular and adequate nighttime residence.

74.  Mr. WILLIAMS has worked in construction and gardening but has been institutionalized most of his life.  He is described as a "gentle giant," and tries to stay out of the way of the authorities because they have repeatedly taken all of his belongings. "*But just when I'm recovering and replenishing my survival gear from the last sweep, I am subjected to another raid. I have to start all over again.*"

75.  Twice in June of 2022, Defendant CHP accompanied CALTRANS in a "trash sweep" at the places in Santee where Mr. WILLIAMS was sleeping. After they arrived, Defendants prevented him from gathering his personal belongings and forced him to watch as they tossed everything he, and others, owned into a trash truck. They made no attempt to separate actual trash from personal properties.

76.  Defendants, in an apparent attempt at a cruel inside joke, did take the time to post a "Notice" at that site that read:

> *"To reclaim personal property call _____.
> Failure to reclaim property by 9-1-2022 will result
> in its disposal."*

B. <u>**Defendants.**</u>

77.  Defendant **COUNTY OF SAN DIEGO ("COUNTY")** is a public entity existing under the laws of the State of California and is the operator and employer of the **SAN DIEGO SHERIFF'S DEPARTMENT ("SDSD")** and its Deputies, and is liable for all the actions of SDSD and its other agencies and entities and personnel referenced herein. The County's Code Compliance Team is responsible for enforcement of codes and ordinances in the unincorporated areas of the County, which include the CITY OF LAKESIDE.

23

78. Defendant **CITY OF LAKESIDE ("LAKESIDE")** is an unincorporated community in the East County region of San Diego County. According to its Chamber of Commerce website, LAKESIDE is a "census-designated place" founded in 1886 and is governed by the COUNTY. LAKESIDE's law enforcement agency is the SDSD LAKESIDE DIVISION and its Deputies, who are sometimes joined by the SDPD or the El Cajon Police Department ("ECPD") during "sweeps" of homeless sites.

79. Defendant **CITY OF SANTEE ("SANTEE**") is a duly organized city located in the East County of San Diego. SANTEE's law enforcement needs are served by the SAN DIEGO SHERIFF'S DEPARTMENT (SANTEE DIVISION) and its deputies, who are also sometimes accompanied by the Sheriffs' Homeless Assistance Response Team ("HART") to execute their "sweeps" of homeless living spaces within its jurisdiction. SANTEE also contracts with and controls and directs the activities of private homeless services agencies such as Alpha Project and PATH ("People Assisting the Homeless") to assist with, and engage in, "sweeps" activities, and property destruction and "trash" collection efforts.

80. Defendant **CITY OF SAN DIEGO ("SAN DIEGO")** is a municipal corporation organized, acting, and existing under the laws of California which, through its agents, including the San Diego Police Department ("SDPD"), arrests, cites, detains, issues stay-away orders, and otherwise punishes people pursuant to MC §54.0110 and other Municipal Codes. It operates within its City limits, and on several properties it owns in the areas of SANTEE and LAKESIDE.

81. Defendant **CALIFORNIA DEPARTMENT OF TRANSPORTATION ("CALTRANS")** is and was at all times herein a public entity and an executive department of the State of California, created and existing under the laws of the State of California, operating in the County of San Diego. It is part of the cabinet-level California State Transportation Agency and manages the State's highway system and properties adjacent thereto.

24

82. Defendant **CALIFORNIA HIGHWAY PATROL ("CHP")** is a state patrol agency and public entity of the State of California. CHP has primary patrol jurisdiction over all California roads and streets outside City limits, and in addition, can exercise any law enforcement powers anywhere within the State. CHP can and does assist local and county government agencies and local and County law enforcement and is the primary law enforcement agency in rural parts of the State.

83. Defendants LAKESIDE and SANTEE regularly, and on various occasions, work together to summon, utilize, and direct the assistance, support, and participation of CALTRANS, SDSD, SDPD, CHP, and other local entities and their agents, deputies, and personnel in committing the actions alleged herein.

84. At all times, the DEFENDANTS acted in concert with, and at the beck-and-call of, one or more of the other DEFENDANTS and their agents, employees, deputies, contractors, and personnel in committing the actions alleged herein.

85. Plaintiffs are informed and believe that the Defendants sued herein as DOE DEFENDANTS 1 - 50 are and were officers, employees, contractors, and/or other agents of the other Defendants, who aided, abetted, assisted, and/or otherwise helped plan, organize, orchestrate or carry out the actions alleged here. Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as DOES 1 - 50 and therefore sue those Defendants by fictitious names. Plaintiffs will seek leave of the Court to amend this complaint to allege their true names when ascertained. Plaintiffs are informed and believe that each of these actors is liable for and participated in the injuries and violations of the laws and rights alleged herein.

## **FACTS**

86. This case arises out of official and ongoing illegal policies and practices by Defendants of chasing homeless people from their jurisdictions by sweeping and raiding sleeping areas and confiscating and destroying the personal property of unhoused people who are Citizens of, and reside in, San Diego's East County without offering them any opportunity to retain, claim, or recover their property.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

25

87. San Diego has earned an ominous position, having the fourth largest homeless population in the country.[10] The escalating homeless crisis in San Diego County is directly linked to the lack of affordable housing. As of 2014, the median rental cost of a studio apartment in San Diego was 110% of the amount of an SSI check, which at the time was less than $900 a month.[11] In 2024, the maximum monthly SSI payment for an individual is $943 and $1,415 for a couple.

88. In San Diego's East County, competition for lower-income housing is high. Renting an apartment or home depends not only on the cost, but how good your credit score is. Landlords receive numerous applications from interested renters and select only those tenants with good references, high credit scores, and higher incomes. This leaves those surviving on limited income without many options. It is not unusual for children to remain living at their parents' residence and for different generations of family members to live in the same household because they cannot afford places of their own.

89. A recent study found that San Diego County needs 137,537 more affordable rental homes to meet regional demand – and that the majority of the region's low-income renters are spending *more than half their income* on housing. Moreover, according to a report by the California Housing Partnership and San Diego Housing Federation, renters need to earn $47.67 an hour to afford monthly average rent of $2,479.[12] In addition, the demand for housing subsidies far exceeds supply. There exists a 10 to 12 year waiting list for Section 8 housing vouchers, with over 600,000 persons on that list alone. The very small amount of existing affordable or subsidized

---

[10]    The 2016 Annual Homeless Assessment Report to Congress, Department of Housing and Urban Development 29 (November 2016). https://www.hudexchange.info/resources/documents/2016-AHAR-Part-1.pdf

[11]    Emily Cooper et al., "Priced Out in 2014: The Housing Crisis for People with Disabilities," Technical Assistance Collaborative (June 2015) (https://www.advancingstates.org/hcbs/article/priced-out-2014).

[12]    "Morning Report: The County's Big Affordable Housing Gap." Voice of San Diego (May 10, 2024) (https://voiceofsandiego.org/2024/05/10/san-diego-countys-big-affordable-housing-gap/).

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

DREHER LAW FIRM

350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

1  housing is also plagued by long waiting lists.[13] San Diego County's latest
2  homelessness census shows the homelessness crisis has hit a new record in 2024,
3  and "*East County has the second highest number of people experiencing*
4  *homelessness outside of the City of San Diego…. We have very few emergency*
5  *shelter beds.*"[14]

6  90. These statistics make it abundantly clear that there exists a <u>direct</u> correlation
7  between the rise in housing costs and the number of homeless people. Despite the
8  obvious need for more, and more affordable, housing, Defendants' actions
9  demonstrate their dehumanizing animus towards the unhoused Citizens in their
10 communities. Instead of taking measures, mandated by law, to address the root
11 causes of homelessness, such as creating safe places for homeless people to sleep,
12 connect with services, and store their possessions, Defendants instead concentrate
13 their efforts solely on using threats of criminalization and arrest of homeless people
14 in order to chase them out of sight.

15 91. Defendants' actions fail to comply with, and are intentionally and directly
16 contrary to and subversive of, their duties and obligations required by Welfare &
17 Institutions Code §17000 and §10000 to "*relieve and support all incompetent, poor,*
18 *indigent persons, and those incapacitated by age, disease, or accident*" residing in
19 the County and to "*provide for protection, care, and assistance to the people of the*
20 *state in need thereof, and to promote the welfare and happiness of all of the people*
21 *of the state by providing appropriate and services to all of its needy and distressed.*"

22 92. Defendants do so by engaging in a campaign of terror against the unhoused
23 residents within their communities as part of their ongoing efforts to rid themselves
24
25 ─────────────────────────
26 [13] Russell, Stephen. "The Affordable Housing Crisis in San Diego: How Do We Meet the Need?"
    San Diego Housing Federation (January 25, 2017).

27 [14] Halverstadt, Lisa. "Homelessness Spikes Again in San Diego County," Voice of San Diego,
    (May 22, 2024) https://voiceofsandiego.org/2024/05/22/homelessness-spikes-again-in-san-diego-
28 county/; *and see* Ramirez, Jasmine. "Residents concerned over 150 sleeping cabins coming to
    Spring Valley to help homeless." CBS 8 (May 8, 2024). San Diego County approves 150 cabins
    for unhoused people | cbs8.com

of homelessness in a series of well-planned, ruthlessly executed raids and "sweeps" designed to harass and threaten homeless people in order to get them to "move along." Defendants' message is clear: "*Go somewhere else*!"

93.    In order to achieve their goal of forcing homeless people to "*Go somewhere else*," Defendants confiscate Plaintiffs' critical survival gear and personal belongings without offering any opportunity for Plaintiffs to retain or reclaim it. Ironically, Defendants often leave the *actual* "trash" behind. These property items are "taken" or destroyed without warrant, reasonable cause, or exigent circumstance, and without providing adequate notice or any opportunity for Plaintiffs to be heard. Further, despite their contrary legal obligations and representations, Defendants fail to safeguard or provide any of Plaintiffs' property for later retrieval, in direct conflict with Defendants' own written policies and knowledge, as well as, State and Federal laws and well-established court rulings, that such actions are illegal (see, i.e., *Lavan v. City of Los Angeles*, 693 F.3 1022 (2012)).[15]

94.    Defendants' stated justifications for their actions – "health & safety," "wildfire risk," "environmental issues" – are a ruse designed to justify a false notion of legitimacy. The sole purpose and intent of these "sweeps" by Defendants is to harass, intimidate, threaten, and ultimately "chase-away" unhoused people from San Diego's East County jurisdictions, despite the fact that they have nowhere to go.

95.    Instead, Defendants' actions are designed to "force out" homeless people by depriving them of items that are critical to their survival and ability to live, such as clothing, tents, blankets, food, work tools, and prescription medications, leaving Plaintiffs even more destitute and vulnerable. Defendants also destroy Plaintiffs' irreplaceable and intimate personal items such as family photographs, jewelry, and

---

[15]    See also, *i.e.*: Cal. Civ. Code §2080 et seq; *Pottinger v. City of Miami*, 801 F. Supp. 1551 (SD FL 1992); *US v. Gooch*, 6 F.3d 673,677 (9th Cir. 1993); *Kincaid v. City of Fresno*, 2006 WL 3542732 (ED Cal. 12/8/2006); and City of San Diego Settlement/Order, *Isaiah Project v. City of San Diego*, USDC, S.D. Cal #08cv2699 BTM (WVG); Defendants' Notices to Vacate indicating Individual Plaintiffs may pick up their personal property within 90 days.

DREHER LAW FIRM

350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

DREHER LAW FIRM

350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

even the ashes of deceased relatives, while actively preventing Plaintiffs and Class Members from gathering these important belongings before leaving. In many instances, Plaintiffs lose "everything" they have in their possession.

96. In addition, Plaintiffs have observed that some of their more valuable property is stolen for personal profit and gain by Defendants' city workers, contractors, and law enforcement personnel who place such property inside their personal trucks or patrol vehicles. Plaintiffs' counsel has made Defendants aware of this, yet no investigation or cessation of these theft activities has occurred.

97. Prior to their "sweeps" against Named Plaintiffs and Class Members, Defendants sometimes place signs near the sites of their sweeps claiming to provide "72 Hour Notice of Cleanup and Property Removal." These notices state that "*Personal property that is sanitary and saleable or useable or otherwise reasonably appears to be of value will be stored for 90 days…[and] can be claimed by calling _____, Monday through Friday from 7:00 a.m. to 2:00 p.m.*" Often these signs contain no actual contact telephone number, but instead contain only blank lines.

98. These posted signs are fraudulent, intended and used by Defendants only to proffer the illusion that Notice is being given and rules are being followed, when in reality no actual "notice" is given. The "Notice" times stated on the signs are not adhered to; Defendants fail to keep or store any of Named Plaintiffs' or Class Members' property or make it available for retrieval or claiming; and, as previously indicated, occasionally there are no phone numbers listed on the signs to begin with. What's more, listed phone numbers aren't answered by Defendants anyway. [16]

---

[16]     On May 31, 2023, Plaintiffs' counsel called a rare phone number listed on Defendants' "Notice." An agent of Defendants answered the call and informed counsel that they "*do not handle such matters in their jurisdiction,*" and told counsel to "*contact Kelly Gower at 858-492-5012.*" Counsel then called and left a message for "Kelly Gower" as instructed. A week later, on June 7, 2023, Counsel, having received no callback from "Kelly Gower," left another message for "Kelly Gower" in reference to the "90-Day Notice" to pick up personal belongings pursuant to the posted Notice. On June 12, 2023, Counsel received a voicemail message from an agent of Defendants saying only "*Do not call back again.*"

99.     Defendants' raids and "sweeps" begin when they arrive with large trash compactor trucks, into which they immediately begin tossing Plaintiffs' personal property. Defendants then threaten Plaintiffs with citation and/or arrest if they do not immediately "*move along.*" Plaintiffs are given no opportunity to gather their belongings, despite requesting such. Plaintiffs are forced to watch as everything they own is trashed, while Defendants hurl insults, profanities, and slurs.

100.     Counsel first attempted to intercede on behalf of Plaintiff Class Members in June 2022, in an attempt to convince Defendants to cease these illegal activities and avoid this litigation. However, Defendants rejected these attempts, and instead continued to ruthlessly execute these "sweeps" and destroy Plaintiffs' personal property without regard for its ownership, importance to their survival, or intrinsic value, and in blatant disregard of the laws protecting Plaintiffs' property from such actions.

101.     For example, on June 1, 2022, CALTRANS posted a Notice to Vacate near the Highway 67 Bridge in Lakeside, stating that Plaintiff Class Members had until Monday, June 6th to vacate and remove their belongings. However, on Thursday, June 2nd, CALTRANS arrived early and forced all the unhoused people to "*move along*" or "*be arrested.*" Although the Notice indicated that those impacted could retrieve their personal property until September 1, 2022, in reality, nothing was kept as CALTRANS, aided by CHP officers, tossed everything into a trash crusher truck and destroyed it. There was nothing left to "claim" or retrieve.

*102.*     CALTRANS justified this "sweep operation" under the guise of "*wildfire risk,*" claiming their actions were necessary due to "imminent risk of wildfires" caused by the conditions there. Yet, after CALTRANS' cleanup crews took and destroyed all of the unhoused individuals' personal belongings, they cut down all the shrubbery in the area and left it there in piles, where it dried out for weeks and became the highly combustible "*imminent wildfire risk*" they were purporting to eliminate by their actions.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

103.     Defendants should be well aware that their actions violate their legal obligations regarding removal and destruction of personal property on public land. On July 24, 2008 CALTRANS entered into a class action settlement in which it agreed that its actions in sweeping and immediately destroying people's property were illegal, and CALTRANS further agreed to comply with the *Kincaid* Court's Injunction across the State of California enjoining and preventing such actions in the future, while paying $1,485,000 to compensate victims of their actions.[17] As such, there is no legitimate reason or excuse for Defendants' actions here.

104.     Since Plaintiff's counsel first began monitoring Defendants' sweeps and property destruction, there have been numerous encounters between Class Members and Defendants. Only once were Class Members purportedly permitted to attempt to "retrieve" their personal property. This took place after an "agreement" was reached in which SANTEE's City Attorney agreed that Defendants would store and make available for retrieval by Plaintiffs the property items that Defendants had taken in a scheduled sweep at the San Diego River Bottom in late August 2023.

105.     However, when Plaintiffs arrived at SANTEE's designated "pickup" location on September 5, 2023, they found that SANTEE's offer was a falsehood. All of their property taken by Defendants had been damaged, destroyed, and dumped into a large "trash dump pile" rather than stored and retained in the conditions in which it had been taken. Clothing and smaller items were stuffed randomly inside trash bags; bicycles had been twisted, bent and crushed, as if they had been run through trash-compactor-trucks. Plaintiffs' more valuable property was not there. Somewhere beneath those piles also lay the mangled, discarded, and disregarded laws and rules which should have prevented such activities by Defendants.

---

[17]     *Kincaid v. City of Fresno, 06-CV-1445 OWW (Eastern Dist. Of California, Fresno Division)*; Judge Oliver W. Wanger stated during oral argument that *"the practice of announce, strike, seize [and] destroy immediately is against the law."* (*https://www.aclunc.org/our-work/legal-docket/kincaid-v-city-fresno*)

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

31

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

106.    In recent weeks, Defendants have begun their "Spring Cleaning" activities designed to continue pushing unhoused residents "*anywhere else*" and out of sight. In an effort to avoid such encounters, Plaintiffs and Class Members have been forced to relocate to remote bridges under Highway 67 and public property along the San Diego River Bottom where they have a chance to be "unseen." These areas are unsuitable for habitation, exposing the unhoused to dangerous and inclement conditions such as flash flooding and mosquito infestations.

107.    San Diego's East County has no homeless shelters or hotel voucher programs. Some East County cities make it their express policy to exhibit extreme hostility towards homeless people, such as directing homeless people to leave and go to another city, while deliberately avoiding the creation of any shelters or assistance programs, in order to discourage homeless citizens from "being" there. Defendants target their removal and property destruction activities against homeless citizens when temperatures dip into the low 30's or when the unhoused are recovering from devastation caused by flooding that results from storms, and during times when temperatures rise above 100 degrees. Defendants have also installed jagged-edged rocks beneath bridges to prevent people from sheltering there.

108.    Most recently, on Tuesday, April 12, 2024, Defendant CITY OF SAN DIEGO, posted "24-Hour Notice of Cleanup and Removal" on East County property it owns for its public utilities, ostensibly providing 24 hours for the unhoused people living near the Lakeside Open Space to "move." The Notices were stapled, not taped, directly to Plaintiffs' tents, tearing holes in their only shelters from the elements.

109.    Plaintiffs' counsel made several calls that day, starting with the phone number posted on the Notice which indicates that the City of San Diego would store Plaintiffs belongings for later retrieval. The next day the City's Environmental Services Department, accompanied by four SDPD officers, arrived early and began trashing Class Members' property without sorting, evaluation or review. They saved nothing for later retrieval, despite contrary language on their "sweep" notices.

110.    Cleanup crews engaged as agents of Defendant, CITY OF SAN DIEGO, including Urban Corps of San Diego County and Alpha Project employees, had already began throwing items away. One of the officers, SDPD Officer Brent (badge number 5572), expressed two false tropes that Defendants performing these "sweeps" often use to label homeless people in order to justify such actions – that homeless people are "*criminals and drug addicts*" and that they are "*choosing not to work.*" Such statements and opinions are not supported by the evidence. In fact, "Nationally, unhoused people with such problems are in the <u>minority</u>: 21 percent struggle with a serious mental health illness; 16 percent with substance abuse."[18]

111.    Defendants had arrived with two large trash-crusher trucks, but no transport vehicles to collect or store any of Plaintiffs' critical survival gear or important personal belongings. It was very clear that Defendants had no intent to follow the law requiring them to collect and safeguard Plaintiffs' belongings for later retrieval. Community advocates were able to limit Defendants' activities that day to trash cleanup only, but Kelly Gower of the San Diego Environmental Services Department ("SDESD") made it abundantly clear that they planned to return the following morning to take everything else, saying: "*We can take all of this ... most of this stuff is stolen or discounted or whatever.*" – another false trope used by Defendants to justify their knowingly-illegal acts.

112.    Soon Ms. Gower and the SDPD officers present were socializing and laughing while the unhoused people were packing up their important belongings in a frantic effort to avoid their destruction. It was business as usual for Defendants, who made no offers of shelter or services while violating the law, their own rules, and prior Court Orders and Settlement Agreements (see, i.e., *Isaiah Project v. City of San Diego*, supra, Footnote 15 above) prohibiting such actions.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

---

[18]   See, Rosenthal, Tracy. *The New Republic*, Unusual Cruelty: The New Sundown Towns (April 30. 2024) (https://newrepublic.com/article/181036/new-sundown-towns-grants-pass-v-johnson)

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

113.    Defendants have never had any intention of collecting Plaintiffs' personal property and safeguarding it for retrieval during their ongoing "sweeps." Once Plaintiffs' property is "seized" there is no procedure available for them to retrieve their property. Defendants destroy Plaintiffs' property regardless of the fact that it has value to its owners, solely for the purpose of chasing these people "away." These actions and Defendants' use of laws criminalizing homelessness "restrict one's ability to engage in necessary life-sustaining activities in public, *even when that person has no reasonable alternative.*" (emphasis added).[19] Defendants' actions are making the homelessness crisis worse, and their constant and relentless threats of criminal punishment upon Citizens for being poor and unhoused are a cruel and ineffective approach that betrays a deep, willful misunderstanding of the problem of and solutions to homelessness.

114.    Defendants' refusal to provide sufficient affordable housing and shelter is a well-documented bureaucratic failure, which causes and exacerbates the homelessness crisis. East County's approximately 1,700 unhoused residents account for 20% of San Diego County's growing homeless population according to the Regional Task Force on Homelessness ("RTFH").[20]

115.    Supervisor Terra Lawson-Remer, who represents the County of San Diego on the Regional Taskforce for Homelessness' CoC Advisory Board herself acknowledged that "[they] can do a better job of providing the right kind of help

---

[19]    See Herring & Yarbrough (documenting consequences of criminalizing homeless people through move-along orders, citations, and threats, and how that drives people further into poverty) *Social Problems*, Volume 67, Issue 1, February 2020, Pages 131–149 (pub. 3/29/19) https://static1.squarespace.com/static/5b391e9cda02bc79baffebb9/t/5cc1c0569140b7fb43b1af44/1556201561950/Pervasive+Penality+social+problems+(1)+(1).pdf; Katrina Ballard & Samantha Batko, *Three Ways Communities Can Promote Inclusive Public Space and Better Support People Forced to Live Outside*, URBAN INST. (8/7/20), https://www.urban.org/urban-wire/three-ways-communities-can-promote-inclusive-public-space-and-better-support-people-forced-live-outside

[20]    *20% of Region's Homeless Now Live in East County, New Data Shows*, The San Diego Union Tribune, Blake Nelson (May 21, 2022) (https://www.sandiegouniontribune.com/communities/east-county/story/2022-05-21/20-of-regions-homeless-now-live-in-east-county-new-data-shows)

based on people's unique problems, or better yet, make sure they never lose their home in the first place."[21] According to San Diego City Council President Sean Elo-Rivera: "*We must take every opportunity, explore every idea and do all we can to house the unsheltered and prevent more San Diegans from falling into homelessness. Housing is a human right….*"[22] Unfortunately, they don't. Instead, Defendants simply hide the problems by chasing homeless people out of sight.[23]

116.    Since the Defendants have systematically neglected to invest in adequate shelter and successful service programs for its unhoused residents, those experiencing homelessness are enduring "*lasting trauma that makes resolution more costly – and delayed resolution more inhumane.*"[24] In the past two years alone, the number of persons experiencing homelessness in San Diego County has steadily risen each month. In March 2024, there were 1,226 unhoused persons in San Diego County's unincorporated areas, and 1,337 became newly unhoused. Yet, the County continues to ignore the need for affordable housing. According to Jennifer Nations, Managing Director of the Homelessness Hub research lab at UC San Diego, "There's just not enough housing at a price point that people can afford."[25]

---

[21]    *2022 Point in Time Count Data Release*, S.D. Regional Task Force on Homelessness (5/23/22) (https://www.rtfhsd.org/updates/2022-point-in-time-count-data-released/).

[22]    *Id.* And *see*, Rebecca Louis, CEO, Wakefield Housing*: "Opinion: Affordable Housing is in a state of emergency. Let's Act Accordingly."* San Diego Union Tribune (June 3, 2024) (*https://www.sandiegouniontribune.com/opinion/commentary/story/2024-06-03/opinion-housing-shortage-an-emergency-lets-act-like-it*)

[23]    Indeed, after enacting a new law aimed to rid Santee of its unhoused community by chasing them away and doing nothing else, Santee's mayor, John Minto, claimed that the new ordinance *"[D]oes not punish somebody for being homeless…But what it does is, it gives us the ability to protect our communities. **They can go anywhere else, they just can't stay there**.*" See, Santee cracking down on homeless encampments along San Diego River | cbs8.com (1/17/2023).

[24]    Covert, Adrian and Funk, Elizabeth. *Opinion: On Homelessness, Focus on Bringing People Indoors and Saving Lives.* San Diego Union Tribune (April 17, 2024) (https://www.sandiegouniontribune.com/opinion/commentary/story/2024-04-17/homelessness-focus-on-bringing-people-indoors-and-saving-lives)

[25]    Nelson, Blake. "*Homelessness in San Diego County Has Now Risen Every Month for 2 Straight Years.*" San Diego Union Tribune (April 17, 2024). (https://www.sandiegouniontribune.com/news/homelessness/story/2024-04-17/homelessness-in-san-diego-county-has-now-risen-every-month-for-2-straight-years)

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

117.    Despite the mounting evidence that the lack of affordable housing is the driving force for the rise in homelessness, and that there are nowhere near enough shelter spaces to offer to those experiencing homelessness, the County and Cities continue to enact more laws that <u>criminalize</u> homelessness. In 2023, SANTEE enacted a slew of new ordinances that expressly seek to punish unhoused individuals for sleeping, lying down, camping, or storing their belongings on public property within its jurisdiction. SANTEE appears emboldened by its new measures and has apparently increased its enforcement efforts against its unhoused Citizens in 2024.

118.    Instead of creating housing, shelter, and other aid and/or efforts to alleviate homelessness, Defendants, along with their contractors and law enforcement agencies have simply increased their enforcement of the following Municipal Codes, Local Ordinances, and State Penal Code sections against the unhoused in their communities:

<u>Local Ordinances and Municipal Codes</u>

a. San Diego County Code §67.804 Dischare Prohibitions (criminalizing the use of any materials or wastes on public or private lands in a manner and place where they may result in a discharge to water).

b. San Diego County Code §68.503 Unlawful Deposit of Discarded Materials in Public or Private Places (criminalizing the deposit of waste on streets, highway, parks, or campgrounds, or any public or private property as a nuisance);

c. San Diego County Code §73.111 Obstruction of Public Ways (criminalizing a person for standing or sitting in public areas dedicated for public use in any manner that obstructs its free use);

d. San Diego County Code §73.108 Public Parks (criminalizing camping in any public park, street, or unimproved property owned or leased by the County). Camping is defined as the use of any public park, any public street or highway or improved or unimproved property owned or leased by the County, for temporary living accommodations such as, but not limited to, sleeping, sleeping activities, or making preparations to sleep, including the laying down of bedding for the purposes of sleeping, or storing personal belongings, or making any fire, or using any tents, or other temporary structures);

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

e. San Diego Municipal Code §54.0105 (unlawful for any person to place, or allow to remain, any goods, wares, baggage, personal property or merchandise on any sidewalk or curb, between the outer edge of the sidewalk or curb and the property line.)

f. San Diego Municipal Code §54.0209 (illegal dumping);

g. San Diego Municipal Code §54.0210 (littering prohibited);

h. San Diego Municipal Code §54.0212 (property impound);

i. San Diego Municipal Code §63.0406 (removal of personal property, camping paraphernalia, and all other property, contraband, litter, and waste found at an encampment or at a location where a person is engaged in unlawful camping);

j. Santee Ordinance No. 610 (Adding Section 7.20.100 to the Santee Municipal Code to Protect the San Diego River Corridor, Mitigate Wildfire and Flooding Risk, Improve Water Quality, and Prevent the Destruction of Critical Habitat);

k. Santee Municipal Code §7.20.070 (Disposing of Trash on Public Property);

l. Santee Municipal Code §8.08.300 (Disposing of Trash in or Adjacent to Any Watercourse);

m. Santee Municipal Code §7.20.130(A) (Causing or Intending to Cause Fire);

n. Santee Municipal Code §7.20.130(B) (Using or Possessing Competent Ignition Source);

o. Santee Municipal Code §7.20.130(C) (Obstruction of the Flow of Water);

p. Santee Municipal Code §7.20.130(D) (Discharge of Pollutant/Waste);

q. Santee Municipal Code §7.20.130(E) (Threatened Damage to Endangered Species or Critical Habitat);

r. Santee Municipal Code §7.20.150 (Interference with Abatement);

s. Santee Municipal Code §7.20.160 (Violation – Penalty);

State Statutes

a. Cal. Penal Code §602 (criminalizing trespassing);

b. Cal. Penal Code §374.4(a) Unlawful to Litter;

c. Cal. Penal Code §647(e) (criminalizing "lodg[ing] in any building, structure, vehicle, or place whether public or private, without the permission of the owner or person entitled to the possession or in control of it");

d. Cal. Penal Code §148(a) (prohibiting willfully resisting, delaying or obstructing agency or law enforcement personnel, from issuing citations when an "individual refused to vacate an encampment" after "notice";

e. Cal Penal Code §372 ("unlawfully obstruct[ing] the free passage or use, in the customary manner, of any…public park, square, street, or highway"); and

f. Cal. Penal Code §647(c) (criminalizing "willfully and maliciously obstruct[ing] the free movement of any person on any street, sidewalk, or other public place or on or in any place open to the public").

119. Unhoused individuals regularly identify that their primary obstacle to obtaining permanent housing is unaffordable rents. This is not a problem that can be solved by criminalization and punishment.[26] Criminal enforcement separates unhoused people from their property, drives them further into poverty, and creates barriers to employment, housing, and financial stability. Such actions cause further trauma, increased vulnerability to violence, and makes homeless people more likely to remain homeless—ultimately making our communities less safe.

120. Since Defendants do not offer or provide sufficient, adequate or accessible shelter places to accommodate unhoused people, they should not even be conducting sweep operations. Due to the lack of accessible shelters or storage places, Defendants' policies and practices are fundamentally unfair, and, as such, Plaintiffs have been subject to, and are at ongoing risk of being subject to, Defendants' continued unconstitutional criminalization and property destruction.

121. Defendants' miniscule efforts to house their homeless Citizens are not keeping pace with the number of people losing their homes in San Diego County. According to San Diego Regional Task Force on Homelessness ("RTFH") data, 14,258 individuals sought homeless services *for the first time* from October 2022

---

[26] "…[R]esearch shows that criminalization perpetuates rather than discourages homelessness, disqualifying unhoused people from the support they need, including federal housing benefits. A criminal record and credit scores wrecked by civil debt mean fewer employers or landlords willing to give them a chance. In the short term, arrests and sweeps interrupt the efforts of service providers. Unhoused people lose medication, critical documents, survival gear, and fragile support networks, losses that compound the physical and emotional toll of living outdoors."[26] Rosenthal, Tracy. *Unusual Cruelty: The New Sundown Towns*, The New Republic, pg. 13 (April 30, 2024) (https://newrepublic.com/article/181036/new-sundown-towns-grants-pass-v-johnson).

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

through September 2023 and only 8,832 formerly unhoused individuals *exited* homelessness. As RTFH's CEO Tamera Kohler explained: "*Housing and homelessness are directly tied together, and when rental costs go up, so do the numbers of people experiencing homelessness.… Increased housing opportunities are needed to turn the dial on the regional [homelessness] crisis.*"[27]

122.    Defendants' tactics in East County are designed merely to frighten and intimidate homeless people such that they go "somewhere else," while ignoring the fact that the problem of homelessness is worsening.  Instead, Defendants willfully avoid their obligations to work to remedy the problem.[28]

123.    Moreover, people from *all* demographics are falling into homelessness for the first time due to San Diego's high cost of living – not because of mental illness or substance abuse. Many became homeless for the first time during and shortly after the Covid pandemic due to an unexpected health crisis, loss of employment or after the moratorium on evictions was lifted. Named Plaintiffs and Class Members include veterans who have served this country and survivors of sexual assault who are struggling to put their lives back together.

124.    The resulting cost for the County's failure to address the homeless crisis is high. In January 2024, RTFH reported that 1,385 San Diegans became homeless for the *first* time while only 966 *exited* homelessness. Again, this data confirms what the Defendants already know – that local "efforts," such as they are, to combat homelessness aren't keeping up with the number of people losing their homes.[29]

---

[27]  Voice of San Diego, *San Diego's Housing Efforts Aren't Keeping Pace with Newly Homeless.* Lisa Halverstadt (December 1, 2023); https://voiceofsandiego.org/2023/12/01/san-diegos-housing-efforts-arent-keeping-pace-with-newly-homeless/

[28]  See Rosenthal, Tracy; *Unusual Cruelty: The New Sundown Towns*, Fn. 18, *supra.*

[29]   Regional Task Force on Homelessness San Diego, HMIS Date Newsletter, January 2024; https://www.rtfhsd.org/wp-content/uploads/HMIS-Data-Newsletter-January-2024.pdf; & see Lisa Halverstadt, "Homelessness Spikes Again in San Diego County," Voice of San Diego, (May 22, 2024) https://voiceofsandiego.org/2024/05/22/homelessness-spikes-again-in-san-diego-county/.

125.    Instead of combatting the causes of homelessness, Defendants resort to cruel, ruthless, and hostile actions towards homeless people in their communities. Defendants continue to threaten Class Members with aggressive raids, "go away" orders, fines, arrests, and confiscation and destruction of their belongings. Yet, as Defendants are well aware, "leaving" is an impossibility because sleeping outdoors is unavoidable when there's nowhere else to "go."

126.    In a recent article published by the San Diego Union Tribune, the author opined that "Homelessness is complex and multifaceted, requiring complex and multifaceted responses. Evaluation done in partnership between government, universities, program providers and funders, and people with lived experience of homelessness, [are] vital to identifying those programs and services that can move us toward a future where homelessness is a rare and brief occurrence.  Only together can we finally create lasting change."[30]

127.    This tracks with the experiences of Plaintiffs, whose voices are drowned out by the politicians who find it easier to use them as talking points in their campaigns for re-election. It's easier to blame the unhoused for society's problems than it is to work on the *actual* problems and offer *real* long-lasting solutions. Those experiencing homelessness become the scapegoats, and politicians always seek someone to blame.[31]

128.    Unfortunately, Defendants have been unwilling to engage in any meaningful conversation about more successful strategies to reduce homelessness in our communities with the most important stakeholders – those with lived experience. Plaintiffs' counsel invited CALTRANS to join Plaintiff Class Members with "lived-experience" to address homelessness in its jurisdiction, but CALTRANS refused.

---

[30]    Nations, Jennifer, "Opinion: Evaluation of Homelessness Programs Can Do Much More Than Save Money." San Diego Union Tribune (April 29, 2024) (https://www.sandiegouniontribune.com/opinion/commentary/story/2024-04-29/opinion-evaluation-of-homelessness-programs-can-do-much-more-than-save-money).

[31]    Rosenthal, Tracy. *Unusual Cruelty: The New Sundown Towns*, pgs. 5-6, Fn. 18, *supra*.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

129.     In every instance in which Plaintiffs filed an official complaint regarding Defendants' continued property destruction and "theft" of Plaintiffs' personal property by Defendants themselves, Defendants dismissed these complaints without any bona fide investigation. For example, in response to Plaintiffs' written complaint regarding the "sweep" and property destruction that occurred on May 15, 2023 (County File Number: 230430), the County Counsel responded as follows:

> *"Your claim has been reviewed within the terms and restrictions of those laws. We regret that investigation has obliged us to conclude that the claim must be rejected. Therefore, the claim is hereby rejected this date."*

130.     It is a missed opportunity when our own leaders and government fail to listen to the voices of the oppressed and fail to do anything constructive to solve public problems, especially when laws and statutes specifically require them to do so. In this case, Plaintiffs are instead marginalized and discriminated against due to their poverty – usually caused by circumstances outside of their control such as a serious health condition, loss of employment, increasing cost of living, or a tragic personal event that has left them unable to keep up with the demands of life. And not everyone is fortunate enough to have a family support system when their world falls apart and they need a safe place to land for a while.  Not everyone has a degree or career to fall back on. Not everyone recovers from a disabling and debilitating health condition or injury. Those experiencing homelessness did not *choose* to be homeless. They are our mothers and fathers, brothers and sisters, our sons and daughters, our neighbors and friends.

131.     Indeed, SANTEE mayor John Minto's words betray Defendants' primary goals, policies, and actions, and describe Defendants' willful violations of law, with crystal clarity:

> *"Homeless people can go anywhere else, they just can't stay here."*

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

41

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

## REQUISITES FOR RELIEF

132.     Defendants' policies, actions, and conduct have resulted and will continue to result in irreparable injuries to Plaintiffs. Plaintiffs have no plain, adequate, or complete remedies at law to address the wrongs described herein. Defendants have made it plain by their actions and the ongoing nature of their activities that they intend to continue the unlawful conduct described herein.

133.     Defendants have adopted and enacted customs, policies, and/or practices of confiscating and destroying the personal property of Plaintiffs and Members of the Class without legal basis and the Defendants have participated and will continue to participate in implementing these policies and practices unless and until restrained by an injunctive decree of this Court.

134.     Defendants' actions violate Plaintiffs' established constitutional rights, and Defendants could not reasonably have thought that their conduct in intentionally seizing and immediately destroying all of Plaintiffs' personal property as alleged herein was lawful or consistent with Plaintiffs' constitutional rights.

135.     Actual controversies exist between Plaintiffs and Defendants because Defendants engaged in unlawful and unconstitutional conduct and intend to continue such, whereas Plaintiffs claim such conduct to be unlawful and unconstitutional.

136.     As a direct and proximate result of the unconstitutional and unlawful policies, practices, and conduct of Defendants, Plaintiffs and Members of the Plaintiff Class have suffered, and will continue to suffer damages, including but not limited to deprivation and destruction of property, including clothing, bedding, prescription medications, personal documents, and other personal possessions, leaving them without their essential personal belongings necessary for shelter, health, well-being, and personal dignity.

137.     Defendants' actions are willful, wanton, malicious, and oppressive and done with conscious disregard and deliberate indifference for Plaintiffs' rights.

138.    On June 20, 2023, Plaintiffs submitted an administrative claim with the County of San Diego pursuant to California Government Code §§900 *et seq.*, on behalf of themselves and all Class Members, addressing the issues raised herein, and asking the County to cease and desist such actions. The County rejected Plaintiffs' claim and request without any explanation on July 18, 2023.

139.    On November 6, 2023, Plaintiffs submitted another administrative claim with County Counsel via email pursuant to Govt. Code §§900 et seq., on behalf of themselves and all Class Members. Defendants failed to act on the claims within 45 days after they were presented (Govt. Code §912.4(a)). The COUNTY was presumed to have rejected these claims by failing to respond to them in the statutorily prescribed period of time (Govt. Code §912.4(c)). However, on January 18, 2024, Plaintiffs' counsel received a written response from Senior Deputy, Office of County Counsel, Michelle Acosta. In this letter, the COUNTY refuted Plaintiffs' complaint, insisting that they believed that the <u>landmark</u> *Martin v. Boise* case[32], and by implication the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and their corollaries in the California Constitution, do not apply to the COUNTY'S actions, and that therefore the COUNTY is not obligated to follow any law in that regard. The COUNTY made no efforts to investigate Plaintiffs' claims, stories, or facts. Accordingly, Plaintiffs have exhausted administrative remedies (Govt. Code §912.4(a)).

### FIRST CLAIM FOR RELIEF
**Unreasonable Search and Seizure**
**Under Fourth Amendment to the U.S. Constitution**
***Pursuant to 42 U.S.C. §1983***
**(All Plaintiffs Against All Defendants)**

140.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

/ / /

---

[32]    *Martin v. Boise*, 920 F.3d 584 (2019) at 616-17.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

43

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

141.    The Fourteenth Amendment protects against all unreasonable searches and seizures and specifically protects individuals from being arrested or having their property searched and seized by law enforcement without probable cause that a crime has been committed. U.S. Const. Amend. IV.; *Kincaid v. City of Fresno*, 2006 WL 3542732, at *35-37 (E.D. Cal. Dec. 8, 2006) "[S]eizure of homeless people's personal property without probable cause […] violates the Fourth Amendment to the United States Constitution."

142.    The Fourth Amendment prohibits property destruction under these same circumstances. Courts have held that local governments must refrain from summarily seizing and destroying the personal property of unhoused individuals. *See Lavan v. City of L.A.*, 797 F. Supp. 2d at 1012. The Court in *Lavan* held that the Fourth Amendment protects homeless from government seizure and summary destruction of their unabandoned property, including momentarily unattended personal property. *aff'd, Lavan*, 693 F. 3d 1022, and 1030.

143.    Other Courts have expanded this protection explaining that "even if the seizure of the property would have been deemed reasonable had the City held it for return to its owner instead of immediately destroying it, the City's destruction of the property rendered the seizure unreasonable." *Garcia v. City of L.A.*, 11 F. 4th 1113, 1124 (9th Cir. 2021) ("our prior caselaw states clearly that the government may not summarily destroy the unabandoned personal property of homeless individuals that is kept in public areas").

144.    Defendants' above-described customs, policies, practices, and conduct of confiscating and destroying Plaintiffs' personal property without warrant, probable cause, exigent circumstances, or adequate notice violate Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

145.    Individual Plaintiffs and others living in San Diego's East County, including many unhoused people served by Plaintiff, HOPE, are being and will continue to be subject to raids, sweeps, searches, property seizures, arrests, "move along" orders, and being "chased away" without probable cause or reasonable suspicion. They live under constant and imminent threat of being subject to these unconstitutional searches and seizures, as well as, property destruction – which permanently deprives them of their belongings.

146.    Defendants have an intentional, active, and official policy, custom, and practice of seizing and destroying unhoused people's personal belongings without making any objective assessment or determination about whether it poses a threat, solely for the purposes of chasing people "away." In addition, Defendants have intentional, active, and official policies of undermining and endangering homeless people's health and safety, and deliberately and intentionally ignoring and failing to follow their statutory obligations to protect and care for their Citizens.

147.    Defendants' have created, and exhibit, utilize and have in effect policies, customs, and practices of indiscriminately taking all personal property from unhoused individuals and disposing of it without sorting it or saving any of it for later retrieval, while ignoring the timely and contemporaneous objections of unhoused people crying out to have their belongings preserved. Defendants make no effort to retain or preserve any of the property that they confiscate from Plaintiffs, even though it is obvious that most of the property is valuable to the Plaintiffs and in many cases, represents virtually everything they own. This widespread destruction belies any suggestion that Defendants' practice is to remove only clearly abandoned or hazardous property. *See, e.g., Mitchell*, 2016 WL 11519288 at *3-4 (C.D. Cal. Apr. 13, 2016); *Rios v. County of Sacramento*, 562 F. Supp. 2d 999, 1017 (E.D. Cal. 2021); *see also Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559 (S.D. Fla. 1992).

148.     Defendants by their actions have ignored the Fourth Amendment and acted in ways they *know* to be unconstitutional, by treating unhoused individuals as less than citizens. As a direct and proximate consequence of Defendants' unconstitutional acts and unconstitutional policies and practices, the Named Plaintiffs and Class Members have suffered and will continue to suffer from the continuous, persistent, and imminent threat of having their personal property summarily seized and destroyed. Plaintiffs request injunctive relief to stop the property destruction by Defendants and to require Defendants adopt constitutionally-sound policies.

149.     Defendants' actions are also intended to frustrate, undermine, and deplete Plaintiff HOPE's assistance and social service efforts and resources, which Defendants believe will more quickly force the departure and "move along" orders of Named Plaintiffs and Class Members in San Diego's East County.

**SECOND CLAIM FOR RELIEF**
**Denial of Right Against Unreasonable Search and Seizure-**
**Under Article 1, §13 of the California Constitution**
**(All Plaintiffs Against All Defendants)**

150.     Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

151.     The California Constitution involves even greater protections than the US Constitution with respect to arrest, search, and seizure. See Cal. Const., Art. I, §13; *In re Lance W.*, 37 Cal. 3d 873, 879 (1985).

152.     Defendants have deliberate and active policies, customs, and practices of conducting sweeps, raids, searches, property seizures and destruction, arrests, and "move along" orders designed and intended to harass and threaten unhoused people, including Named Plaintiffs and Class Members, without providing notice of such, nor of any services or places to be or offers of such. Such policies and actions violate the protections of Article I, Section 13 of the California Constitution.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

### THIRD CLAIM FOR RELIEF
**Violation of Prohibition Against Cruel or Unusual Punishment**
**Under Article I, §17 of the California Constitution**
**(All Plaintiffs Against All Defendants)**

153.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

154.    While the Eighth Amendment protects against cruel *and* unusual punishments, the California Constitution protects against cruel *or* unusual punishments. *See* Cal. Const. Art. I, § 17. The California Constitution protects against all punishments that would not violate the Eight Amendment. *See California v. Carmony*, 127 Cal. App. 4th 1066, 1085 (2005) (recognizing this distinction is "purposeful and substantive rather than merely semantic"); *In re Alva*, 33 Cal. 4th 254, 291 n. 20 (2004) (collecting cases). Critical to the difference in analysis is whether the government is "treat[ing] its [residents] with respect for their intrinsic worth as human beings." *Carmony*, 127 Cal. App. 4th at 1085 (citations omitted). Clearly, that is not the case here.

155.    Defendants' customs and practices of threatening, arresting, citing, fining, and destroying the property of hundreds of unhoused people, when those people have no choice but to live in public space, constitute inhumane punishment that does not respect the intrinsic worth of unhoused individuals as human beings in violation of California's prohibition against cruel or unusual punishment.

156.    The California Constitution protects citizens against all punishments including those that may not violate the Eighth Amendment to the US Constitution. *See California v. Carmony*, 127 Cal. App. 4th 1066, 1085 (2005) (recognizing this distinction is "purposeful and substantive rather than merely semantic"); *In re Alva*, 33 Cal. 4th 254, 291 n. 20 (2004). Critical to the difference in analysis is whether the government is "treat[ing] its [residents] with respect for their intrinsic worth as human beings." *Carmony*, 127 Cal. App. 4th at 1085 (citations omitted). It is undisputed here that Defendants do not treat Plaintiffs with any such respect.

47

157.    Defendants' customs and practices of raiding, sweeping, threatening, chasing, and destroying the property of hundreds of unhoused people, when those people have no choice but exist in public space, constitutes inhumane punishment that does not respect the intrinsic worth of unhoused individuals as human beings.

158.    The provisions of the California Constitution are self-executing and create a private right of action for declaratory or injunctive relief. *Katzberg v. Regents of Univ. of Cal.*, 29 Cal. 4th 300, 307 (2002). Accordingly, Named Plaintiffs and Class Members request this Court grant injunctive relief preventing Defendants from continuing these actions.

**FOURTH CLAIM FOR RELIEF**
**Denial of Procedural Due Process and Equal Protection**
**Under the Fourteenth Amendment to the U.S. Constitution**
***(42 U.S.C. §1983)***
**(All Plaintiffs Against All Defendants)**

159.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

160.    The Substantive Due Process Clause of the Fourth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The Fourteenth Amendment to the U.S. Constitution prohibits the government from depriving any person, including homeless persons, of their property without due process of law.

161.    The Fourteenth Amendment thus protects homeless individuals from having their property seized and destroyed by government agencies and law enforcement without significant due process safeguards - including advance notice, reasonable time to move property, and "bagging and tagging" of all confiscated non-hazardous property for later recovery at a suitable location. *Lavan v. City of Los Angeles*, 693 F. 3d 1022, 1028-29; 1032 (9th Cir. 2012) (14th Amendment requires governments to take "*reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return*"); see *O'Callaghan*

*v. City of Portland*, No. 3:12-CV-00201-BR, 2013 WL 5819097, at *4 (D. Or. Oct. 29, 2013).[33]

162.    Defendants' policies, customs, and practices of seizing and immediately destroying unhoused people's personal belongings without any notice or an opportunity to be heard, and without any meaningful way to collect their property, are violations of the Fourteenth Amendment.

163.    Defendants' policies and practices of taking and trashing Plaintiffs' possessions without providing opportunity to reclaim and collect such taken property continue, subjecting Named Plaintiffs and the Class Members to persistent and imminent threats of having their personal property seized and destroyed without due process of law, for the sole purpose of "chasing them away."

164.    Moreover, Defendants' conduct violates the Equal Protection Clause because it disproportionately affects a suspect class and impinges on the exercise of Named Plaintiff and Class Members' exercise of a fundamental right. *Plyer v. Doe*, 457 U.S. 202, 216-17 (1982). In the instant case, Defendants "move along" orders, ticketing, arresting or threats of the same directly infringes on Named Plaintiffs and Class Members Right to Travel. Defendants issue citations, engage in property destruction, and threaten arrest or criminal prosecution even though Named Plaintiffs and Class Members have no reasonable alternative but to utilize the rudimentary shelter provided by their tents and/or vehicles. This conduct has the purpose and effect of depriving or threatening to deprive Named Plaintiffs and Class Members of the necessities of life, including food, shelter, and prescription medications, thereby preventing Named Plaintiffs and Class Members from traveling and residing in San Diego's East County.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

---

[33]    The City of San Diego is aware of its obligations under the 14th Amendment, inasmuch as it was previously sued for such, and is obliged per Court Order and Settlement Agreement to comply with those obligations not to take and destroy homeless peoples' property but instead to make it available for recovery, in *Isaiah Project v. City of San Diego*, USDC Southern District of California #2009CV2699 BTM/WVG.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

165.     Defendants' unlawful actions and the resulting injuries entitle Named Plaintiffs and Class Members to compensatory damages, including damages for emotional distress. Named Plaintiffs and Class Members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**Violation of Procedural Due Process and Equal Protection**
**California Constitution, Article 1, §7(A).**
**(All Plaintiffs Against All Defendants)**

166.     Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

167.     In adopting and implementing these policies and practices with the intent to harm and disadvantage homeless persons in the San Diego's East County, the Defendants have violated the Equal Protection Clause of the California Constitution, Article 1, § 7(a).[34]

168.     The due process protections under the California Constitution are more expansive than those under the U.S. Constitution. *See* Cal. Const., Art. I, §§ 7(a), 15; *Ryan v. Cal. Interscholastic Federation-San Diego Section*, 94 Cal. App. 4th 1048, 1070 (2001) ("procedural due process under the California Constitution is much more inclusive and protects a broader range of interests than under the federal Constitution") (citations omitted).

169.     The California Constitution requires that "even in cases in which the decision-making procedure will not alter the outcome of governmental action, due process may nevertheless require that certain procedural protections be granted the individual in order to protect important dignity values." *People v. Ramirez*, 25 Cal. 3d 260, 268 (1976). The purpose of these safeguards is "to ensure that the method of interaction itself is fair in terms of what are perceived as minimum standards of political accountability-of modes of interaction which express a collective judgment

---

[34]   *See, Footnote 17, above.*

that human beings are important in their own right, and that they must be treated with understanding, respect, and even compassion." *Id.*

170.    Furthermore, in California, "due process safeguards…must be analyzed in the context of the principle that freedom from arbitrary adjudicative procedures is a substantive element of one's liberty." *Id.* at 268. Defendants' policies and actions are based on Defendants' animus towards this disfavored group and thus violate the safeguards afforded by the California Constitution that promote due process and equal protection under the law.

171.    Defendants' policies, customs, and practices of chasing, sweeping, and seizing and destroying unhoused people's personal belongings violate the basic tenants of procedural due process, and fail to confer the dignity, respect, and compassion required by the California Constitution.

### SIXTH CLAIM FOR RELIEF
**Exposure to a State-Created Danger**
**Fourteenth Amendment to the U.S. Constitution**
***Pursuant to 42 U.S.C. §1983***
**(All Plaintiffs Against All Defendants)**

172.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

173.    The Fourteenth Amendment to the U.S. Constitution prohibits government action that affirmatively places a person in a position of danger and deprives that person of substantive due process rights guaranteed by the Fourteenth Amendment to the U.S. Constitution. *See* U.S. Const. Amend. XIV.

174.    Local and state governments violate the substantive due process rights of unhoused people when they place unhoused individuals in more vulnerable situations by confiscating critical survival belongings that they use for shelter, warmth, and protection from the elements. *See Santa Cruz Homeless Union v. Bernal*, 514 F. Supp. 3d 1136 at 1144-1145 (N.D. Cal. 2021); *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012).

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

51

175.    Defendants have customs, practices, and policies of harassing and chasing unhoused people from public spaces by seizing and destroying their personal property, such as tents and personal items that are necessary for their survival. Defendants engage in these practices without ensuring that shelter and/or housing or storage options are available to the unhoused individuals they are targeting.

176.    Without any other available options for shelter and without their tents and survival gear, unhoused individuals are forced to live exposed to the elements, without protection from the cold, wind, rain, and heat. Defendants' conduct places Plaintiffs, Class Members, and Disabled Subclass Members in dangerous situations that they would not otherwise face, and severely jeopardizes their physical and mental health and overall well-being. As a direct result of Defendants' unconstitutional actions, Named Plaintiffs and Class Members are at a significantly higher risk of harm, resulting in the exacerbation of their circumstances and putting their lives at risk. Disabled Subclass Members face an even harsher reality as Defendants' actions force them into situations that worsen their disabilities and jeopardize their immediate health and safety.

177.    Defendants' conduct continues even while they refuse to provide shelter to unhoused individuals who are actively seeking it from Defendants. Defendants' callous indifference towards Plaintiffs' plight is particularly cruel and evident during the coldest and hottest times of the year as East County suffers some of the most extreme weather conditions in San Diego County. Defendants know that their actions endanger the health and safety of unhoused individuals, and take these actions in an effort to make homeless people disappear. *See*, Footnote 23, above.

178.    Defendants know or should know that their conduct places unhoused people who live in East County at an elevated risk of serious and often imminent harm to their health and safety. In the absence of Defendants' conduct, Named Plaintiffs, Class Members, and Subclass Disabled Members would not face such an elevated risk.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

179.    Defendants have acted with reckless disregard or deliberate indifference to the known or obvious risks of harm – including malnourishment, illness, exposure to the outdoor elements, and/or aggravation of disabilities – to which they subject Plaintiffs, Class Members, and Disabled Subclass Members by using threats of enforcement of various Municipal Codes, Local Ordinances, and State Penal Code violations for the sole purpose of chasing those experiencing homelessness "away."

180.    Defendants' policies and practices have, and will continue to, put Plaintiffs, Class Members, and Disabled Subclass Members in immediate danger. Moreover, Defendants' actions do nothing to properly address the homelessness crisis or improve public safety in their jurisdictions. On the contrary, Defendants' actions serve as a reminder that without accountability, governments will violate the rights of the most vulnerable in order to appease those with wealth and opportunity.

### SEVENTH CLAIM FOR RELIEF
**Exposure to a State-Created Danger**
**Article I, §7(a) of the California Constitution**
**(All Plaintiffs Against All Defendants)**

181.    Government actions that affirmatively place persons in a position of danger deprives those persons of substantive due process rights guaranteed by the California Constitution. Cal. Const., Art. I, § 7(a).

182.    Defendants' policies, customs, and practices of removing unhoused people from public spaces by repeatedly chasing them away with raids and sweeps and by seizing and destroying their property, such as tents and personal items, and without providing or offering any services or housing alternatives, endangers the lives, health, and safety of unhoused people, including Named Plaintiffs, Class Members, and Disabled Subclass Members in ways that shock the conscience. Defendants know or should know that their actions endanger the health and safety of unhoused individuals.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

183.   Defendants' continued actions violate the California Constitution's prohibition of state-created-dangers when they force Named Plaintiffs, Class Members, and Disabled Subclass Members into increasingly dangerous and life-threatening situations, leaving Plaintiffs, Class Members "worse off." As a direct and proximate result of Defendants policies and practices, Defendants have affirmatively acted by chasing Named Plaintiffs, Class Members, and Disabled Subclass Members away from one location to another, and without their now destroyed tents and life-sustaining belongings, further and further to locations that are devoid of basic services, protection from the elements, and/or disability access, and where they face an elevated risk of harm.

184.   As a direct and proximate result of Defendants' practices and policies described herein, Named Plaintiffs', Class Members', and Disabled Subclass Members' health and safety were and are placed in grave danger in violation of the California Constitution. Named Plaintiffs, Class Members, and Disabled Subclass Members were injured and damaged in that they suffered serious harm and were forced to bear the medical costs of those harms. In addition to that cost, the Named Plaintiffs suffered emotional and mental distress because of the danger created by Defendants' unlawful actions. Defendants' unlawful conduct and the resulting injuries entitle Named Plaintiffs, Class Members, and Disabled Subclass Members to compensatory damages, including damages for emotional distress.

### EIGHTH CLAIM FOR RELIEF
### Inverse Condemnation - Cal. Const. Art I §9
### (All Plaintiffs Against All Defendants)

185.   Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

186.   California Constitution, Article I §19(a), states: "Private property may be taken or damaged for public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court, for the owner."

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

187.    Defendants have engaged in the regular and mass taking and destruction of homeless people's private property. In return, the Defendants have not offered or paid any just compensation.

188.    Defendants' taking and destruction of Plaintiffs' property has occurred with no compensation, assistance, shelter or alternatives offered or given to unhoused individuals, and thus constitutes inverse condemnation in violation of the California Constitution.

### NINTH CLAIM FOR RELIEF
**Violation of Right to Association**
**(First & Fourteenth Amendments and 42 U.S.C. §1983)**

189.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

190.    Defendants' actions, including their use and invocation of Municipal Codes, Local Ordinances, and State Penal Codes as weapons to threaten Plaintiffs and chase them "away," in violation of Plaintiffs', Class Members', and Disabled Subclass Members' constitutional rights to association in two related yet distinct contexts: the right to familial association and the right to expressive association.

191.    The Ninth Circuit has routinely found that the right to familial association is protected under both the First and Fourteenth Amendments. *See Keates v. Koile*, 883 F.3d 1228, 1235-36 (9th Cir. 2018). ("Accordingly, we have held that claims under both he First and Fourteenth Amendment for unwarranted interference with the right to familial association could survive a motion to dismiss.") (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)).

192.    Defendants by their actions are attempting to prevent, and effectively preventing, Named Plaintiffs, Class Members, and Disabled Subclass Members from "being present" in the public areas of San Diego's East County, where they and their friends and family reside, when no alternatives exist. Defendants' message is

clear: "*Homeless people can go anywhere else; they just can't stay here.*"[35] Sadly, for those Named Plaintiffs, Class Members, and Disabled Class Members who are and have been residents of San Diego's East County who have fallen into homelessness, primarily due to the lack of affordable housing or an unexpected life event, there are no alternative housing options.

193.    Moreover, Defendants' unconstitutional conduct restricts Plaintiffs, Class Members, and Disabled Class Members from engaging in routine activities such as grocery shopping and employment in violation of the 14th Amendment right to association. Recently, Disabled Subclass Members' requests for accommodations made via their counsel to Defendant SANTEE have resulted in hotel vouchers that relocate them to hotels in Hotel Circle through the EQUUS voucher program. EQUUS' criteria remain clouded as all efforts to communicate with Subclass Members' social workers or EQUUS directly have received no response. It is more than coincidental that counsel's recent requests for accommodations to Defendant SANTEE have resulted in hotel vouchers in Hotel Circle, far from SANTEE, which isolate Plaintiffs and Class Members from their community, family, and right to expressive association protected under the First Amendment. This right enables citizens to assemble or otherwise gather for church, social meetings, educational workshops, community gatherings, and virtually anything that could reasonably be construed as protected permissible expressive associational activity. See, *Santropietro v. Howell*, 857 F.3d 980, 989 (9th Cir. 2017) ("Association for the purpose of engaging in protected activity is itself protected by the First Amendment. '[I]mplicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'")(citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 3252 (1984)).

---

[35]    Statement of Mayor John Minto, Santee Mayor; see FN 23, above.

DREHER LAW FIRM

350 W. ASH STREET SUITE 101

SAN DIEGO, CA 92101

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

194.    As a result of Defendants' unconstitutional policies and practices in enforcing and threatening to enforce their Municipal Codes, Local Ordinances, and State Penal Code violations in manners that literally preclude Named Plaintiffs, Class Members, and Disabled Subclass Members from physical presence in San Diego's East County, Named Plaintiffs. Class Members, and in particular Disabled Subclass Members, are substantially prohibited from exercising their right to expressive associated protected by the First Amendment, or to associate with others in the pursuit of political, social, economic, educational, religious, and cultural ends.[36] Most of the named Plaintiffs and Plaintiff Class Members were born and raised and live in East County. Disabled Subclass Members who have been "moved" to Hotel Circle are locals and long-time residents of East County who call it home. Defendants' actions have removed them from their entire support network (including access to employment opportunities), family, and friends. This further marginalizes Plaintiffs, under color of law, making access to resources more complex and unduly restricting Named Plaintiffs, Class Members, and Disabled Subclass Members from exercising their rights to familial and expressive association.

195.    Plaintiffs have suffered and will continue to endure emotional and mental distress as well as humiliation because of this violation of their rights. Defendants' unlawful conduct and the resulting injuries entitle Named Plaintiffs, Class Members, and Disabled Subclass Members to compensatory damages for emotional distress. Named Plaintiffs and putative Class Members and Disabled Subclass Members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

---

[36]    On June 3, 2024, Plaintiff LEGGOTT boarded the trolley station closest to Hotel Circle to start a new job he'd gotten in San Diego's East County using the trolley pass he received from his case worker, purportedly given him for that purpose. About half-way along to El Cajon, he was confronted by a police officer who asked him to produce his trolley pass. He was then informed that this trolley pass was not active and that he would need to depart the trolley. He had to walk back to Hotel Circle, which took several hours because he lacked the financial means to pay for alternative transportation, having already used his sparse funds to pay someone to watch his dog.

**TENTH CLAIM FOR RELIEF**
**Discrimination Against Persons with Disabilities**
**(Americans With Disabilities Act (ADA), 42 U.S.C. §12131 *et. seq*.**
**and California Government Code §11135)**

196.　　Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

197.　　Title II of the Americans with Disabilities Act provides "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. Such discrimination includes administration of programs in a way that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. §35.130 (b)(3)(ii).

198.　　A government's removal of unhoused individuals and their possessions from public property, as well as the provision of services or shelter to unhoused individuals, are programs, services, and/or activities covered by Title II of the ADA. The opportunity to comply with a public entity's directives in a manner consistent with one's disability is a covered "benefit" under the ADA. Administration of programs or activities in a way that unduly burdens disabled persons by imposing a different or greater burden on them is "discrimination."

199.　　The ADA's implementing regulations specifically proscribe "methods of administration" that "defeat or substantially impair accomplishment" of a program's objectives as to individuals with disabilities. 28 C.F.R. § 35.130(b)(3). They also prohibit providing aids, benefits, or services in such a way that qualified individuals with a disability are not afforded an "equal opportunity to obtain that same result…as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii).

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

58

200.    Failure to provide proper assistance, additional time, or other supports to disabled individuals when demanding that unhoused people remove themselves or their belongings from public space is a violation of the ADA. See, *Cooley v. City of Los Angeles*, 2019 WL 3766554, at *6 (C.D. Cal. Aug. 5, 2019) ("Cooley […] told LAPD officers that she needed help to carry her property because of her disability and that she lost most of her essential property because her needs were not accommodated […] the City's practices, even if facially neutral, violate the ADA by unduly burdening people with disabilities such as Cooley").

201.    Failing to provide shelter options to unhoused people that meet their disability needs violates the ADA, as it means that shelter is functionally unavailable to them because of their disability. *See Bloom v. City of San Diego*, 2018 WL 9539238, at *3 (S.D. Cal. June 8, 2018) ("[B]ecause of plaintiffs' disabilities, they cannot seek housing in a homeless shelter because the homeless shelter cannot accommodate their disabilities...*[and]* the shelters are 'functionally unavailable' to them").[37]

202.    Defendants discriminate against unhoused individuals by willfully and intentionally failing to provide adequate notice, time, and assistance to unhoused people with disabilities who are forced to constantly and repeatedly move themselves and their belongings from public space in response to Defendants' homeless sweeps. Defendants further discriminate against unhoused individuals with disabilities by arresting, citing, fining, and seizing the property of unhoused people for sleeping, lodging, or camping in public without first identifying their individualized needs and whether Defendants' shelter options, if any exist, can actually meet those needs.

---

[37]    Cal. Gov. Code §11135 is intended to prohibit all forms of discrimination prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more protective of people with disabilities. By administering its programs for unhoused people and response to homelessness in a manner that has a discriminatory effect on people with disabilities, Defendants have violated, and continue to violate, Section 11135.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

203.    Forcibly removing disabled unhoused residents and chasing them to other unknown places without first identifying and offering alternative shelter or services that meet the individualized needs of people with disabilities, as Defendants are doing, does not serve any compelling or bona fide or legitimate interest.

204.    Plaintiffs ALBONE, BISHOP, GILLETTE, LEGGOTT, McCOY, WHALEY, and a significant number of other unhoused individuals and Disabled Subclass members served by Plaintiff HOPE, have physical and/or mental health disabilities and have been injured by Defendants' discriminatory response to unhoused residents. These Plaintiffs are each "qualified individual[s] with disability[ies]" as defined by the ADA. 42 U.S.C. §12102; 42 U.S.C. §12131; 28 C.F.R. §35.104.

205.    Defendants are "public entities" as defined by the ADA. 42 U.S.C. §12131; 28 C.F.R. §35.104. Defendants have discriminated against Individual Disabled Plaintiffs and Disabled Subclass Members by enforcing relocation directives and conducting property seizures and destruction activities in ways that impose different and greater hardships on disabled Plaintiffs as a result of their disabilities.

206.    Defendants have denied Plaintiffs meaningful access to the benefit of compliance with its directives to relocate in a manner consistent with their disabilities.  As a direct and proximate cause of Defendants' actions, Individual Disabled Plaintiffs and Disabled Subclass Members have suffered, and will continue to suffer, injury and loss.

207.    Plaintiffs ALBONE, BISHOP, GILLETTE, LEGGOTT, McCOY, WHALEY, and a significant number of unhoused individuals served by Plaintiff, HOPE, have physical and/or mental health disabilities and have been injured by Defendants' discriminatory response to unhoused residents with disabilities through their actions and failure to adopt policies and procedures that protect those unhoused

individuals with disabilities. Defendants' actions and those of its employees, agents, contractors, and law enforcement agencies were taken pursuant to the Defendants' policies, patterns, and/or customs of discriminating against people with disabilities by imposing different and greater hardships on them and denying them the benefit of compliance with their directives in a manner consistent with their disabilities. These policies, patterns, and/or customs violate the ADA. All Individual Plaintiffs with disabilities and Disabled Subclass Members are entitled to injunctive and declaratory relief prohibiting Defendants from engaging in these unconstitutional customs, policies, and practices.

### ELEVENTH CLAIM FOR RELIEF
**Failure to Provide Reasonable Accommodations; and
Intentional Discrimination / Deliberate Indifference
(Americans with Disabilities Act (ADA)
42 U.S.C. §12132; 42 U.S.C. §12133)
(All Disabled Subclass Member Plaintiffs Against All Defendants)**

208.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

209.    To avoid discriminating against individuals with disabilities, public entities are required to provide Reasonable Accommodations and/or Modifications to policies or practices. A public entity that fails to provide reasonable disability accommodations, particularly after such have been requested, commits a stand-alone violation of Title II of the ADA. 28 C.F.R. §35.130(b)(7).

210.    A public entity has a duty to consider all resources available for use in the funding and operation of a service, program, or activity when determining whether a requested accommodation can be offered.  If a public entity determines that a particular accommodation cannot be provided, it has a duty to provide a written statement of the reasons for reaching that conclusion. 28 C.F.R. §35.164.

211.    Defendants violated their duties and Plaintiffs' rights under the ADA by ignoring or otherwise failing to respond to each Individual Plaintiffs' Reasonable

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

Accommodation request including *in person* requests for assistance in relocation when disabled Plaintiffs were obviously struggling with mobility challenges such as walkers, canes, and wheelchairs. Furthermore, Defendants failed to investigate the viability of Individual Plaintiffs' requested accommodations and did not engage in any interactive process with them other than laughing at them and throwing away their survival gear, including their prescription medications, walkers, canes, and wheelchairs, along with other irreplaceable belongings.

212.    Defendants fail to respond to, investigate or engage with Reasonable Accommodation requests, and intentionally operate under an absence of any policies or processes for receiving, processing, and responding to such requests, and thereby disregard and ignore such requests from unhoused persons with disabilities.

213.    Defendants further violate their duties and Individual Plaintiffs' rights under the ADA by failing to provide Reasonable Accommodations for Individual Plaintiffs' with mobility impairments, even though Individual Plaintiffs specifically requested Reasonable Accommodations that existed. Instead, Defendants toss Plaintiffs' mobility aids such as walkers, canes, and wheelchairs into the trash.

214.    Defendants have committed acts of intentional discrimination under Title II of the ADA by demonstrating deliberate indifference, because they had knowledge that harm to disabled persons and their rights, including Named Disabled Plaintiffs' and Disabled Subclass Members' rights, under the ADA were substantially likely to occur, and they failed to act upon such likelihood.

215.    Individual Plaintiffs' needs for reasonable and necessary disability accommodations were obvious in many instances and known to Defendants, and were requested. Many Individual Plaintiffs with disabilities have visible mobility impairments, as they rely on walkers, canes, and/or wheelchairs. Plaintiffs made reasonable accommodation requests during, and in advance of, "homeless sweeps" and/or in writing to Defendants, which Defendants acknowledged receiving.

216.     Defendants failed to investigate, respond to, or fulfill Individual Plaintiffs' Reasonable Accommodation requests, or to offer any modification of their policies, practices, or customs for enforcement of relocation directives and property seizures and disposal and/or destruction activities. As a direct and proximate result of Defendants' past and continued failure to provide Reasonable Accommodations under the ADA, all Plaintiffs with disabilities have suffered and continue to suffer injury and loss.

217.     Defendants do not have, and refuse to create or follow, adequate policies and processes for receiving, processing, and responding to Reasonable Accommodation requests, and they continue to engage in policies, patters, practices, and/or customs of disregarding Reasonable Accommodation requests from unhoused persons with disabilities. Accordingly, Plaintiffs are entitled to injunctive and declaratory relief prohibiting Defendants from failing to provide Reasonable Accommodations in the future. As a direct and legal result of Defendants' actions and omissions, the disabled Individual Disabled Plaintiffs and Disabled Subclass Members have suffered injury and loss, including serious emotional distress, and are entitled to compensatory and declaratory damages. In addition, Individual Disabled Plaintiffs and Disabled Subclass Members are entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

**TWELFTH CAUSE OF ACTION**
**Violation of §504 of the Rehabilitation Act of 1973**
**(29 U.S.C. §794)**
**(On Behalf of Disability Subclass Members)**

218.     Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

219.     Defendants receive financial assistance from the federal government whose purpose is to finance a broad range of services, including health care, education, social services, infrastructure, and public safety.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

220.     Section 504 of the Rehabilitation Act of 1973 requires that qualified persons with disabilities be provided meaningful access to federally funded programs. In order to assure such access, Reasonable Modifications are required unless the recipient of federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program (29 U.S.C. §749; 24 C.F.R. §§8.3; 8.4; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

221.     Defendants' actions and omissions have denied Named Disabled Plaintiffs' and Disability Subclass Members' rights to Reasonable Modifications thereby denying them meaningful access to public facilities and places to safely be and sleep, and to the amenities that the County, Cities and Caltrans offer their residents without disabilities, and subjecting them to discrimination on the basis of their disability, in violation of §504 of the Rehabilitation Act. Defendants' actions also effectively undermine Federal assistance that is provided by other entities.

222.     As a result of Defendants' violations of the Rehabilitation Act, Plaintiffs have suffered and continue to suffer injuries, including emotional injuries, and are entitled to compensatory damages, including damages for emotional distress. In addition, Named Disabled Plaintiffs and Disability Subclass Members are entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

### THIRTEENTH CLAIM FOR RELIEF
**Violation of Mandatory Statutory Duty**
**(Cal. Gov't Code §815.6; Civ. Code §2080 *et. seq.; and* §3422.)**
**(All Plaintiffs Against All Defendants)**

223.     Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

224.     California Government Code §815.6 creates a cause of action if and when a public entity fails to discharge a mandatory duty imposed by enactment. California Civil Code §2080 *et. seq.* imposes a mandatory statutory duty on public entities and their employees, agents, contractors, and law enforcement agencies to

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

64

maintain or safeguard unattended property over which they have charge, and also imposes a mandatory duty to abide by specific procedures and processes related to the storage, documentation, and disposition of property.

225.    Defendants' above-described actions, customs, policies, practices, and conduct violate Civil Code §2080 *et seq.*, by, among other things, failing to safeguard the personal property of Named Plaintiffs, Class Members, and Disabled Subclass Members found on public land, failing to inform the owners of the personal property within a reasonable time of finding it, failing to document the property found, and failing to make restitution to its owners or to make arrangements to permit them to retrieve it, all of which are mandatory duties under §2080 et seq. for which Defendants are liable. In addition, Defendants' actions are designed and intended to risk or endanger the health and safety of Plaintiffs and Class members.

226.    Defendants' employees, agents, contractors, and law enforcement agencies took charge of Plaintiffs' property, which was not abandoned. Rather than complying with their mandatory duties and obligations under Civil Code §2080 *et seq.* to maintain, document, and store property for temporary safekeeping, Defendants and their employees, agents, contractors, and law enforcement summarily destroyed these items as part of their efforts to intimidate and chase homeless citizens "away" from their resident towns.

227.    Defendants' employees, agents, and contractors failed to use due care or protect and preserve Plaintiffs' property as required by Civ. Code §2080 *et seq.* when they summarily took or destroyed Plaintiffs' property in public locations; failed to provide written receipt or notice that property would be destroyed; and failed to track or otherwise store the property so that it could be located upon request.

228.    The failures of Defendants and their employees, agents, and contractors to comply with the mandatory duties outlined in Civ. Code §2080 *et seq.* proximately caused Plaintiffs harm, including property loss, emotional distress, anxiety, and pain and suffering, and Plaintiffs are entitled to compensatory damages for such.

229.    Defendants' violations of law are ongoing and continue to harm Plaintiffs. Plaintiffs are therefore entitled to injunctive relief to prevent further breaches of Defendants' obligations.  Merely providing pecuniary compensation will not afford adequate relief; it will be extremely difficult to ascertain the amount of compensation which would afford adequate relief; and judicial restraint is necessary to prevent a multiplicity of judicial proceedings. See Cal. Civ. Code §3422.

## FOURTEENTH CLAIM FOR RELIEF
### Violation of California Welfare & Institutions Code §17000
### (All Plaintiffs Against All Defendants)

230.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

231.    California Welfare and Institutions Code §17000 provides that *"Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."*

232.    Named Plaintiffs, Class Members, and Disabled Subclass Members are among those who are the intended beneficiaries of Welfare and Institutions Code §17000 inasmuch as they are incompetent, poor, and/or indigent persons and/or persons incapacitated by age, disease, or accident and lawfully resident in San Diego County who are not supported or relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

233.    Defendants by their actions, policies, and procedures are deliberately and intentionally undermining, undoing, operating counter to, subverting, and failing and refusing to comply with W&I Code §17000 in that the Defendants are (a) refusing to "relieve or support" Named Plaintiffs, Class Members, and Disabled Class Members who are homeless and as such by definition are not otherwise

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

66

supported, and (b) destroying any such relief and support that may or should be provided. Defendants are thus violating the most basic tenets of human rights, and are actively and intentionally endangering the health and safety of Plaintiffs.

234.    As such the Court should order that Defendants' actions cease, and that Defendants should comply in all ways with Welfare & Institutions Code §17000.

**FIFTEENTH CLAIM FOR RELIEF**
**Conspiracy to Deprive Plaintiffs of Their Constitutional Rights**
***Pursuant to 42 U.S.C. §1983***
**(All Plaintiffs Against All Defendants)**

235.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

236.    When government actors collectively agree to violate individuals' constitutional rights, and take any steps in furtherance of that agreement, all relevant public agencies and employees are liable for conspiracy pursuant to Section 1983. *See, Mendocino Environmental Center v. Mendocino County*, 192 F. 3d 1283, 1301 (9th Cir. 1999).

237.    Defendants have entered into both explicit and implicit agreements with one another to ignore, disregard, circumvent, and violate the constitutional and legal rights of unhoused people by threatening, chasing, intimidating, arresting, citing, fining, and destroying the property of unhoused people without providing adequate notice or adequate shelter in violation of the U.S. and California Constitutions – under the banner of interagency operation and cooperation.

238.    Defendants have each taken concrete steps in furtherance of these agreements and Plaintiffs will continue to be harmed as a direct and proximate result of Defendants' ongoing conspiracy. As such, Named Plaintiffs, Class Members, and Disabled Subclass Members have suffered and will continue to suffer injuries, including emotional injuries, and are entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

### SIXTEENTH CLAIM FOR RELIEF
### Violation of the Bane Act - California Civil Code § 52.1
### (All Plaintiffs Against All Defendants)

239.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

240.    The Bane Act, California Civil Code §52.1 *et seq.*, establishes a remedy for actual or attempted interference with existing rights under Federal and California law. In particular, Section 52.1(a) provides that if a person interferes, or attempts to interfere, "by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or the rights secured by the Constitution or laws of this State," then the Attorney General, or any District or City Attorney, may bring a civil action for equitable relief. Section 52.1(b) further allows "[a]ny individual" so aggrieved to sue for "[statutory] damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured." Cal. Civ. Code § 52.1(b); *see also, Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 841-43 (2004).

241.    The word "interferes," as used in the Bane Act, means "violates." See, *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 336-37 (1998). Thus, the essence of a Bane Act claim is that the Defendants, by threats, intimidation or coercion, violated some statutory or Constitutional right, be it State or Federal, of the Plaintiff. *Id.* at 344. The "[u]se of law enforcement authority to effectuate a stop, detention …, and search can constitute" a threat, intimidation or coercion. *Cole v. Doe 1 Through 2 Officers of Emeryville Police Dept.*, 387 F. Supp. 2d 1084, 1103 (N.D. Cal. 2005). Whether or not an action qualifies as a "threat, intimidation or coercion" is broadly construed. *See Venegas*, 32 Cal. 4th at 850-51.

68

242.    In the instant case, Defendants' policies, practices, procedures, and conduct of sweeping, raiding, chasing-away, threatening, trashing, and harassing Plaintiffs constitute interference, and attempted interference, by threats, intimidation, and coercion, with Plaintiffs' exercise and enjoyment of rights secured by the laws of the United States and California, in violation of Civil Code §52.1.

243.    There was and is no lawful justification for Defendants to threaten, intimidate, or coerce any of the Named Plaintiffs, Class Members, and Disabled Subclass Members, or to attempt to use threats, intimidation, or coercion as described herein to interfere with Plaintiffs' exercise of their rights. Defendants' actions were and are taken willfully and with malice and oppression in order to deter and/or prevent Named Plaintiffs, Class Members, and Disabled Subclass Members from exercising their protected constitutional and statutory rights.

244.    Plaintiffs and Class / Subclass Members are entitled to injunctive and other equitable relief to protect their peaceful exercise and enjoyment of their rights.

### SEVENTEENTH CLAIM FOR RELIEF
**Common Law Conversion**
**(All Plaintiffs Against All Defendants)**

245.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

246.    Named Plaintiffs, Class Members, and Disabled Subclass Members are and were at all relevant times the owners of the personal property confiscated and destroyed by Defendants. These Plaintiffs remain entitled to the possession of their personal property. The property which was confiscated, stolen, seized, and destroyed by Defendants included tents, clothing, prescription medications, medical devices, irreplaceable personal memorabilia, and important documents, all of which were particularly valuable to Named Plaintiffs, Plaintiff Class Members, and Disabled Subclass Members in part because these belongings amounted to much, if not all, of the few possessions that these Plaintiffs owned.

69

247.    Defendants' practices and conduct denied Plaintiffs the peaceful use and possession of their property and constituted an unlawful conversion of that property to the possession and control of Defendants, and Plaintiffs are entitled to recovery of the value of such.

248.    In addition, Named Plaintiffs, Class Members, and Disabled Subclass Members are entitled to relief for the emotional and mental distress they have suffered, as well as humiliation due to the repeated violations of their property rights. Defendants' unlawful actions in "taking" Individual Plaintiffs', Class Members', and Disabled Subclass Members personal property for Defendants' own personal use, and the resulting injuries, entitle Plaintiffs and Class Members to compensatory damages, injunctive and declaratory relief, restitution, and recovery of their attorneys' fees and costs.

### EIGHTEENTH CAUSE OF ACTION FOR RELIEF
### Declaratory Relief
### (All Plaintiffs Against All Defendants)

249.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

250.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated 42 U.S.C. §1983 by inflicting cruel and unusual punishments upon Plaintiffs by punishing their homeless status by citing, arresting, pressuring and obtaining stay-away orders, and otherwise punishing Plaintiffs by utilizing Municipal Codes, Local Ordinances, and State Penal Code violations to criminalize homelessness. In addition, an actual controversy exists between Plaintiffs and Defendants as to whether Defendants, in doing the acts alleged herein, have violated Plaintiffs' United States and California Constitutional rights—including Equal Protection, Due Process, and freedom from Unreasonable Search and Seizure and Cruel and Unusual Punishment.

70

251.     Named Plaintiffs, Class Members, and Disabled Subclass Members are persons desiring declarations of their rights and duties with respect to Defendants, within the meaning of Code of Civil Procedure §1060 because Plaintiffs are, and represent the interests of, unhoused residents and taxpayers directly affected by Defendants' actions.

252.     Plaintiffs desire a judicial determination of the duties of Defendants, and of Defendants' non-compliance with 42 U.S.C §1983, and whether Defendants have abridged or violated Plaintiffs' United States and California Constitutional rights. Such declaration is necessary and appropriate at this time in order that Defendants can comply with their duties, and so that the rights, health, and safety of Named Plaintiffs, Class Members, and Disabled Subclass Members and the public can be protected and not further endangered.

## NINETEENTH CLAIM FOR RELIEF
### Injunctive Relief
### (All Plaintiffs Against All Defendants)

253.     Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

254.     Defendants' ongoing "sweeps," threats, intimidation, seizure, and summary destruction of Plaintiffs' personal property leave Plaintiffs without the essential survival gear they need to protect themselves from the elements and with nowhere to seek alternative shelter. Moreover, Defendants make absolutely *no* effort to retain obviously valuable property so that it can be later recovered by its owners. As a matter of both Constitutional and statutory law, there is no lawful basis upon which Defendants may summarily destroy Plaintiffs' personal property.

255.     Defendants' actions in seizing and destroying Plaintiffs' personal property, without adequate notice and opportunity to be heard, violates the U.S. and California Constitutions. Moreover, Defendants' failure to store Plaintiffs' property and permit Plaintiffs the opportunity to claim it violates State and Federal laws.

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

71

256.     Plaintiffs ask this Court to enjoin Defendants from: (1) issuance of citations or threats that criminalize Plaintiffs for their involuntary status of homelessness and without an adequate offer of shelter; and (2) taking, removing, and destroying Plaintiffs' personal property without due process, and without reasonable opportunity to retrieve their property at a later time. Plaintiffs also request that the Court issue an order restraining Defendants from taking any future actions in furtherance of, and in the manners set forth in this Complaint, which essentially penalize the unhoused for their status of being unhoused.

257.     Unless and until Defendants are enjoined by order of this Court from failing to comply with their obligations under the law, and enjoined from issuing citations enforced in violation of Plaintiffs' Constitutional rights, and until Defendants are ordered to comply with their obligations to refrain from issuing such citations unless and until an alternative is available to Plaintiffs as set forth above, Plaintiffs are suffering and will suffer significant and irreparable injury including:

(a) They will be deprived of rights under Federal and State law;

(b) They will suffer irreparable injury which cannot adequately be remedied by money;

(c) They will suffer injuries which are difficult or impossible to quantify; and

(d) The important rights protected by the California and United States Constitutions may be forever compromised and lost.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiffs request Orders and Judgments as follows:

### A. Declaratory Relief:

1. For an order certifying the proposed Plaintiff Class, together with any necessary and appropriate Subclasses, and appointing the undersigned as Class counsel under Federal Rule of Civil Procedure 23;

2. Declare that Defendants have conspired to deprive unhoused people of their civil rights in violation of 42 U.S.C. §1983;

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

3. Declare that Defendants' ongoing investigation and enforcement of criminal statutes against unhoused people for sleeping, lying, sheltering, lodging, or camping on public property violates the Fourth and Eight Amendments to the U.S. Constitution, Article I, §§13 and 17 of the California Constitution;

4. Declare that Defendants' ongoing seizure and destruction of the personal property of unhoused people violates the Fourth and Fourteenth Amendments to the U.S. Constitution; Article I, §7(a) and §13 of the California Constitution;

5. Declare that Defendants' removal of unhoused people from public property and seizure of their necessary and critical survival gear, in the absence of adequate housing or shelter, violates their right to be free from state-created dangers under the Fourteenth Amendment to the U.S. Constitution and Article I, §7(a) of the California Constitution;

6. Declare that Defendants' ongoing enforcement and seizure practices are government programs that discriminate against unhoused people with disabilities in violation of 42 U.S.C. §12131 and Cal. Gov. Code §11135 and that such practices amount to intentional discrimination and deliberate indifference towards unhoused people with disabilities in violation of 42 U.S.C. §12132 and 42 U.S.C. §12133;

7. Declare that Defendants have violated the Americans with Disabilities Act 42 U.S.C. §12131 *et seq.*, failed to provide reasonable accommodations 42 U.S.C. §12132, intentionally discriminated or with deliberate indifference against disabled persons under 42 U.S.C. §12132 and 42 U.S.C. §12133, and violated §504 of the Rehabilitation Act of 1973 pursuant to 29 U.S.C. §794;

8. Declare that Defendants violated their mandatory statutory duty and Cal. Gov. Code §815.6; Cal. Civ. Code § 2080 *et. seq*; and Cal. Civ. Code §3422;

9. Declare that Defendants' ongoing actions violate their mandatory statutory duties under California Welfare & Institutions Code §§17000 et seq;

10. Declare that Defendants' ongoing actions violate California Civil Code §52.1; *and*

11. Declare that Defendants' conduct of confiscating and destroying Plaintiffs' personal property constituted an unlawful conversion of that property to the possession and control of Defendants;

73

**B. Injunctive Relief:**

1. Grant preliminary and permanent injunctions enjoining and restraining Defendants from investigating, citing, arresting, prosecuting, or otherwise enforcing alleged violations of any ordinance or statute that punishes sleeping, lodging, or camping on public property, or threatening the same, against unhoused individuals in a manner that violates the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 13 and 17 of the California Constitution. This includes a prohibition on the issuance of "move along" orders or other police orders under threat of citation and arrest. The prohibition shall last unless and until Defendants can confirm that all of the East County of San Diego's unhoused residents have immediately available, appropriate, accessible, and voluntary shelter such that they are not being punished for the involuntary status of homelessness.

2. Grant preliminary and permanent injunctions enjoining and restraining Defendants from seizing and disposing of homeless individuals' property in a manner that violates the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I, §§7(a) and 13 of the California Constitution;

3. Order that Defendants cease all actions which undermine, prevent application of, and/or fail to comply in all ways fully with California Welfare & Institutions Code §§17000 et seq;

4. Grant a permanent injunction enjoining and restraining Defendants from removing unhoused people from public property and seizing their property, in the absence of adequate housing or shelter, in violation of the Fourteenth Amendment to the U.S. Constitution and Article I, §7(a) of the California Constitution;

   *and*

5. Grant a permanent injunction enjoining and restraining Defendants from actions that discriminate against people with disabilities in the administration of their programs in violation of 42 U.S.C. §12131 and Cal. Gov. Code § 11135;

74

**C. Mandamus Relief:**

1. Issue a mandatory order compelling Defendants to cease all activities that violate the Fourth, Eighth, and/or Fourteenth Amendments to the U.S. Constitution and Article I, §§7(a), 13, and 17 of the California Constitution;

2. Issue a mandatory Order requiring Defendants to recognize, uphold, and comply with their mandatory statutory duties under California Welfare & Institutions Code §§17000 et seq;

3. Issue a mandatory order requiring Defendants to reasonably modify their programs to avoid any continued discrimination against unhoused people, pursuant to 42 U.S.C. § 12131 and Cal. Gov. Code § 11135 and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et. seq.*;

   *and*

4. Issue a mandatory order requiring Defendants to submit to regular monitoring and compliance checks by the Court at Defendants' expense;

**D. Other Relief:**

1. Order Defendants to pay damages for destruction of Plaintiffs' personal property and emotional distress;

2. For the return of Plaintiffs' property;

3. For nominal, compensatory, punitive, and exemplary damages against the Defendants, to be determined in accordance with proof;

4. For damages in an amount according to proof but in no event less than $4,000 per incident under California Civil Code §§ 52 and 52.1;

5. Order Defendants to pay Plaintiffs' attorneys' fees and costs; *and*

6. Grant Plaintiffs such other and further relief as the Court deems just and proper.

75

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request and demand a trial by jury on all issues so triable.

Dated: June 8, 2024

**LAW OFFICE of
BLANCHE E. MAINE**

By: _____
Blanche E. Maine

*- and -*

Dated: June 8, 2024

**DREHER LAW FIRM**

By: _____
Robert Scott Dreher

*- and -*

Dated: June 8, 2024

**MILLER LAW FIRM**

By: *Matthew R. Miller*
Matthew R. Miller

Attorneys for Plaintiffs and the Class

DREHER LAW FIRM
350 W. ASH STREET SUITE 101
SAN DIEGO, CA 92101

76